Opinion issued March 28, 2019



In The

# Court of Appeals

For The

# First District of Texas

—————————————

## NO. 01-17-00827-CV

—————————————

**NEW MEDICAL HORIZONS, II, LTD. D/B/A CYPRESS FAIRBANKS MEDICAL CENTER, ANAND BALASUBRAMANIAN, M.D., AND DOAN K. NGUYEN, M.D., Appellants**

**V.**

**VICKIE MILNER, Appellee**

---

**On Appeal from the 61st District Court**
**Harris County, Texas**
**Trial Court Case No. 2016-79980**

---

**O P I N I O N**

Appellee Vickie Milner, a diabetic, was admitted to Cypress Fairbanks Medical Center for a left-foot infection. She alleges that the negligence of appellants Anand Balasubramanian, M.D., Doan K. Nguyen, M.D., and the nursing staff of

New Medical Horizons, II, LTD D/B/A Cypress Fairbanks Medical Center led to a gangrenous condition, resulting in amputation of her great toe followed by a protracted recovery.

The appellants moved to dismiss Milner's healthcare liability claims, claiming that her expert's report was inadequate. In this interlocutory appeal, Dr. Balasubramanian, Dr. Nguyen, and the Medical Center contend that the trial court abused its discretion in denying their motions to dismiss. In his three issues, Dr. Balasubramanian argues that the trial court abused its discretion by denying his motion to dismiss because: (1) the report of Milner's expert, Marc E. Mitchell, M.D., failed to establish his qualifications to provide an expert report as to Dr. Balasubramanian; (2) Dr. Mitchell's report failed to provide a sufficient opinion on the applicable standard of care and breach as to Dr. Balasubramanian; and (3) Dr. Mitchell's report failed to link Milner's damages to any specific breach by Dr. Balasubramanian.

In his sole issue, Dr. Nguyen argues that the trial court abused its discretion by denying his motion to dismiss because Dr. Mitchell's causation opinions are conclusory. In its sole issue, the Medical Center argues that the trial court abused its discretion by finding Dr. Mitchell's expert report sufficient and denying its motion to dismiss because Dr. Mitchell's report failed to provide the necessary fair summary

of the standard of care applicable to the Medical Center's nursing staff, a breach of any applicable standard of care, and causation of any injuries by such a breach.

We affirm the trial court's orders.

## Background

The medical records are not before us, and we accept the factual statements in Dr. Mitchell's expert report for the limited purpose of this appeal. *See Marino v. Wilkins*, 393 S.W.3d 318, 320 n.1 (Tex. App.—Houston [1st Dist.] 2012, pet. denied).

On March 22, 2015, Milner presented to the Medical Center's Emergency Department with an infected left foot. Her diabetic status was known by the healthcare providers. Her foot was noted to be swollen and "blood red with some black." She was admitted to the Medical Center that same day under the care of Dr. Balasubramanian, an internal medicine physician who was Milner's attending physician during her hospitalization. Significant findings included hyperglycemia, an elevated white blood count, and x-ray evidence of a metallic foreign body in her left foot. Milner was treated with intravenous antibiotics. Dr. Balasubramanian ordered an infectious disease consultation (which was performed on March 23, 2015), and he also noted that the pulse in Milner's left foot was difficult to palpate. On March 24, 2015, Dr. Balasubramanian ordered a surgical consultation with Dr.

Nguyen, who recommended removal of the foreign body and incision and debridement of the left distal foot.

On March 25, 2015, Milner underwent incision and drainage of the foot by Dr. Nguyen. Noted findings by Dr. Nguyen included that Milner was at high risk for the possibility of eventually losing her toes because of her diabetes and poor circulation. The dorsal tissue on the plantar aspect of the great toe was found to be blackish. After the surgery, Dr. Nguyen noted that Milner tolerated the procedure well and that his plan was for her to undergo wound care and observation.

In the days following the March 25 surgery, there appears to have been little or no physician follow-up or observation of the condition of Milner's foot wound. Dr. Mitchell stated that he saw no evidence in the medical record that Dr. Balasubramanian ever examined the wound until March 30, after Milner was scheduled to be discharged home. There was also little or no documented wound care to indicate whether the wound treatment plan was working. Milner was scheduled to be discharged home on March 30, but when her daughter arrived to pick her up from the Medical Center, it was discovered that Milner had a gangrenous diabetic left-foot infection. Dr. Balasubramanian requested a vascular consult that day.

A March 31, 2015 CT scan showed occlusion of the distal superficial femoral artery, and Milner was moved to the ICU. On April 10, 2015, she underwent

4

amputation of her great toe. On April 5, 2016, Milner had "left above-the-knee femoral popliteal bypass surgery." Her preoperative diagnosis was critical limb ischemia and prior amputation of her great toe. She has continued to require debridement procedures on her left foot.

Milner filed suit, and within the 120-day deadline of section 74.351(a) of the Civil Practice and Remedies Code, she provided the defendants with Dr. Mitchell's original expert report and then an amended report. The defendants objected that these reports failed to satisfy section 74.351(r)(6); the trial court agreed but granted Milner a thirty-day extension to serve a sufficient report under section 74.351(c). Milner then provided Dr. Mitchell's second amended report, which supersedes his initial and first amended reports. *See Cornejo v. Hilgers*, 446 S.W.3d 113, 124 n.11 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). The defendants objected to Dr. Mitchell's second supplemental report (referred to in this opinion as Dr. Mitchell's report) and moved to dismiss Milner's claims for her alleged failure to serve a sufficient expert report under section 74.351. The trial court overruled the objections and denied the motions to dismiss, and this interlocutory appeal followed.

**Chapter 74 Expert Reports**

Section 74.351 of the Texas Medical Liability Act (TMLA) provides that no medical negligence cause of action may proceed until the plaintiff has made a good-faith effort to demonstrate that a qualified medical expert believes that a defendant's

conduct breached the applicable standard of care and caused the claimed injury. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(*l*), (r)(6). "[T]he purpose of the expert report requirement is to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims." *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam).

To constitute a good-faith effort, the report must provide enough information to fulfill two purposes: (1) inform the defendant of the specific conduct that the plaintiff has called into question; and (2) provide a basis for the trial court to conclude that the claim has merit. *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878–79 (Tex. 2001). A report that merely states the expert's conclusions about standard of care, breach, and causation does not fulfill these two purposes. *Palacios*, 46 S.W.3d at 879. The expert must explain the basis for his statements and link his conclusions to the facts. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). It has been recognized that the supreme court "has construed the TMLA as setting a relatively low bar as to what comprises an adequate expert report." *Baty*, 543 S.W.3d at 698 (Johnson, J., dissenting).

In determining whether the report meets these requirements, the court should look no further than the report itself because all of the information relevant to the inquiry must be contained within the report's four corners. *Bowie Mem'l Hosp.*, 79

S.W.3d at 52. The expert report is not required to marshal all of the plaintiff's proof necessary to establish causation at trial. *Id.* An expert report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial. *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 517 (Tex. 2017) (per curiam). The "only question" is whether the report provides "enough information" for the trial court to conclude that it constitutes a good-faith effort. *Id.*; *see also Baty*, 543 S.W.3d at 696–97. We are also mindful that expert-report challenges are made at an early, pre-discovery stage in the litigation. *See Baty*, 543 S.W.3d at 697 & n.10 (rejecting argument that expert report was inadequate, concluding that expert report sufficed "particularly in light of the purposes the report is intended to serve" at an early stage in litigation, and stating "additional detail is simply not required at this stage of the proceeding").

### Standard of Review

We review a trial court's ruling on a motion to dismiss for an abuse of discretion. *Abshire*, 563 S.W.3d at 223; *Palacios*, 46 S.W.3d at 875. "A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles." *Bowie Mem'l Hosp.*, 79 S.W.3d at 52. As a court reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court merely because we would have ruled differently. *See id.* When reviewing decisions that fall within the trial court's

discretion, "[c]lose calls must go to the trial court." *Larson v. Downing*, 197 S.W.3d 303, 304 (Tex. 2006) (per curiam).

**Analysis**

**Qualifications**

In his first issue, Dr. Balasubramanian, an internal medicine physician, contends that the expert report of Dr. Mitchell, a vascular surgeon, failed to establish Dr. Mitchell's qualifications to provide an expert report as to Dr. Balasubramanian.

Dr. Mitchell, a medical doctor who obtained his medical degree from Georgetown University School of Medicine, is a fellowship-trained and board-certified vascular surgeon and general surgeon. He has over twenty years of experience in an academic medical center, where he is actively involved in the training of medical students, has a busy clinical practice, and routinely cares for patients with conditions similar to Milner's. His report states:

> Specifically, I have treated, performed surgery, and managed the care of many patients with diabetic foot wounds. I am very familiar with the accepted standards of medical care for the treatment of a foreign body in the foot of a diabetic patient. Caring for such wounds involves a team approach. I work closely with wound care nursing staff and rely on wound care nursing staff to document the condition of a wound and advise me when a wound is deteriorating. In light of my training, knowledge, experience and qualifications as set forth above, I am familiar with the standard of care for an admitting hospital, wound care nurse, attending physician and surgeon with respect to the care and treatment of Vickie Milner in March, 2015. I am familiar with the responsibilities and duties these parties provide to a patient with the signs, symptoms and history Vickie Milner presented with in March, 2015.

8

Regarding the standards of care applicable to Dr. Balasubramanian and to Dr. Nguyen, an orthopedic surgeon, Dr. Mitchell's report states:

> These standards of care apply to any physician treating an infected foot in the presence of a foreign body in a diabetic patient, regardless of the physician's specialty. Any attempt to create a superficial difference in the standards of care between what would have been expected of an internist and what would have been expected of an orthopedic surgeon, when faced with the facts and circumstances of this case, is a red herring. The standards of care and failures to meet the appropriate standards of care set out in my report, are standards basic to the general practice of medicine that any general practitioner or resident treating diabetic patients with foot infections should know. There is nothing novel about the applicable standards of care for treating a patient with conditions similar to those of Vickie Milner in March, 2015.

Dr. Balasubramanian specifically argues that Dr. Mitchell provides no explanation for how he is qualified to render an opinion on the standard of care for an attending physician who is board certified in internal medicine. Regarding Dr. Mitchell's assertions that he is familiar with treating treating injuries like Milner's and that he is familiar with the standard of care applicable to all healthcare providers who would treat those injuries, Dr. Balasubramanian argues that Dr. Mitchell's assertions are not supported and are conclusory.

In a healthcare liability suit, whether an expert witness is qualified to offer an expert opinion under the relevant statutes and rules lies within the sound discretion of the trial court. *Puppala v. Perry*, 564 S.W.3d 190, 202 (Tex. App.—Houston [1st Dist.] 2018, no pet.). The expert's qualifications must appear in the four corners of

9

the expert report or in the expert's accompanying curriculum vitae. *Id.* "An expert report by a person not qualified to testify does not represent a good-faith effort to comply with the definition of an expert report." *Mettauer v. Noble*, 326 S.W.3d 685, 693 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

To qualify as an expert for the purpose of an expert report against a physician, a person must be a physician who:

(1)    is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2)    has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3)    is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

TEX. CIV. PRAC. & REM. CODE § 74.401(a); *see id.* § 74.351(r)(5)(A) (defining "expert" qualified to give opinion on "whether a physician departed from accepted standards of medical care" as "an expert qualified to testify under the requirements of Section 74.401"). Section 74.401(c) further provides that in determining whether an expert witness is qualified based on his training and experience, a trial court shall consider whether the witness is "board certified or has other substantial training or experience in an area of medical practice relevant to the claim," and whether he "is actively practicing medicine in rendering medical care services relevant to the claim." *Id.* § 74.401(c).

The expert must do more than show that he is a physician, but he "need not be a specialist in the particular area of the profession for which testimony is offered." *Owens v. Handyside*, 478 S.W.3d 172, 185 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). The critical inquiry is "whether the expert's expertise goes to the very matter on which he or she is to give an opinion." *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996); *see Mangin v. Wendt*, 480 S.W.3d 701, 707 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

Also, a physician may be qualified to provide an expert report even if his specialty differs from that of the defendant if he "has practical knowledge of what is usually and customarily done by other practitioners under circumstances similar to those confronting the malpractice defendant," or "if the subject matter is common to and equally recognized and developed in *all* fields of practice." *Keo v. Vu*, 76 S.W.3d 725, 732 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). "'[T]he applicable 'standard of care' and an expert's ability to opine on it are dictated by the medical condition involved in the claim and by the expert's familiarity and experience with that condition.'" *Lee v. Le*, No. 01-18-00309-CV, 2018 WL 4923938, at *4 (Tex. App.—Houston [1st Dist.] Oct. 11, 2018, no pet.) (mem. op.) (quoting *Barber v. Dean*, 303 S.W.3d 819, 826 (Tex. App.—Fort Worth 2009, no pet.)).

As stated in Dr. Mitchell's report, he has treated, performed surgery on, and managed the care of many patients with diabetic foot wounds, and he therefore is

11

familiar with the accepted standards of medical care for the treatment of patients like Milner. He further explains that the applicable standards of care "are standards basic to the general practice of medicine that any general practitioner or resident treating diabetic patients with foot infections should know." Based on these statements alone, the trial court could have reasonably concluded that Dr. Mitchell was qualified to provide standard-of-care opinions under the explicit provisions of section 74.401. *See Lee*, 2018 WL 4923938, at \*4; *Armenta v. Jones*, No. 01-17-00439-CV, 2018 WL 1095388, at \*4–5 (Tex. App.—Houston [1st Dist.] Mar. 1, 2018, no pet.) (mem. op.).

Additionally, this court recently reiterated that the care and treatment of an open wound and infection are common to and equal in all fields of medicine,[1] which comports with Dr. Mitchell's opinion:

> Here, the subject matter of the claim against Dr. Clavijo involves the standards of care in the treatment of an open wound and the prevention of infection. "[T]he care and treatment of open wounds and the prevention of infection are subjects common to and equally recognized and developed in all fields of practice, thus any physician familiar with and experienced in the subject may testify as to the standard of care."; . . .

*Clavijo v. Fomby*, No. 01-17-00120-CV, 2018 WL 2976116, at \*7 (Tex. App.—Houston [1st Dist.] June 14, 2018, pet. denied) (mem. op.) (quoting *Legend Oaks—*

---

[1]     Dr. Balasubramanian's reply brief concedes that "the medical issue being discussed is one of wound management. . . ."

*S. San Antonio, L.L.C. v. Molina*, No. 04-14-00289-CV, 2015 WL 693225, at *4

(Tex. App.—San Antonio Feb. 18, 2015, no pet.) (mem. op.).[2]

The trial court did not abuse its discretion in finding that Dr. Mitchell's report

established his qualifications to opine on the standard of care applicable to Dr.

Balasubramanian. *See id.* at *6–9 (holding that trial court did not abuse its discretion

in concluding cardiologist was qualified to testify on standard of care applicable to

internist for treatment of open wound and infection prevention). We overrule Dr.

Balasubramanian's first issue.

**Standard of Care and Breach**

An expert report must provide a "fair summary" of the expert's opinions

regarding the (1) applicable standards of care, (2) manner in which the care rendered

by the physician or health care provider failed to meet the standards, and (3) causal

---

[2]     *Clavijo* also cited as support *Khan v. Ramsey*, No. 01-12-00169-CV, 2013 WL
        1183276, at *6 (Tex. App.—Houston [1st Dist.] Mar. 21, 2013, no pet.) (mem.
        op.) (holding that expert with over eighteen years of medical experience,
        including ambulatory, urgent, and emergent care, possessed specialized
        knowledge on subject matter common to and equally recognized and
        developed in all fields of practice, i.e., recognizing importance of patient
        history and infection process); *Garza v. Keillor*, 623 S.W.2d 669, 671 (Tex.
        Civ. App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.) ("[T]he standard of
        care in the infection process . . . is common to and equal in all fields of
        medical practice."); and *Gonzalez v. Padilla*, 485 S.W.3d 236, 243–44 (Tex.
        App.—El Paso 2016, no pet.) (care and treatment of open wounds and
        prevention of infection are common to and equal in all fields of medical
        practice). *Clavijo*, 2018 WL 2976116, at *7.

relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6); *Miller*, 536 S.W.3d at 513.

"In a medical malpractice negligence case, the standard of care is what a doctor of ordinary prudence in that particular field would or would not have done under the circumstances." *Windrum v. Kareh*, No. 17-0328, — S.W.3d —, —, 2019 WL 321925, at *3 (Tex. Jan. 25, 2019); *see Palacios*, 46 S.W.3d at 880. "To adequately identify the standard of care, an expert report must set forth 'specific information about what the defendant should have done differently.'" *Abshire*, 563 S.W.3d at 226 (quoting *Palacios*, 46 S.W.3d at 880).

**Dr. Balasubramanian.** Dr. Balasubramanian's second issue asserts that Dr. Mitchell's report failed to provide a sufficient opinion on the applicable standard of care and breach.

Regarding the standard of care applicable to Dr. Balasubramanian (and to Dr. Nguyen, who does not contest the standard of care and breach in this appeal) and its breach by Dr. Balasubramanian, Dr. Mitchell's report states:

> An infected foot in the presence of a foreign body in a diabetic patient is a surgical emergency. Surgical exploration with removal of the foreign body and surgical debridement *should be done* as soon as possible after the diagnosis is made, and within 24 hours at the latest. This is because the development and progression of the infected wound is often complicated by diabetic changes, such as neuropathy and vascular disease. Without early intervention, the wound can rapidly deteriorate, leading to amputation of the affected limb. Therefore, it is at this crucial early stage that physicians have the potential to curb what is often progression from mild infection to a more severe problem, with

14

necrosis, gangrene and often amputation. If there is any doubt regarding diagnosis of peripheral vascular disease, the patient *should be* referred to a specialist for a full vascular assessment.

After surgical debridement, frequent wound assessment and bacterial control and moisture balance *is required* to prevent maceration and infection. Additionally, infection control and restoring pulsatile blood flow is critical for healing of the wound. This requires a team approach. Documentation of the size of the wound *is important* to determine if the wound is healing and the treatment plan is working. Debridement may be a one-off procedure or it *may need to be* ongoing for maintenance of the wound bed. The requirement for further debridement *should be* determined each day following changing of dressings. [Emphases added.].

In stating his opinion on the applicable standard of care, Dr. Mitchell's report states with sufficient detail what a physician should have done and explains why it was the standard of care; it provides "enough information" for the trial court to have concluded that the report constitutes a good-faith effort to set forth the applicable standard of care as to Dr. Balasubramanian. *See Miller*, 536 S.W.3d at 517; *see also Baty*, 543 S.W.3d at 696–97.

Dr. Balasubramanian's actual complaint about Dr. Mitchell's standard-of-care opinion is that Dr. Mitchell insufficiently explains *why* his articulated standard of care *applies* to Dr. Balasubramanian, an internist. This is a reiteration of Dr. Balasubramanian's argument on Dr. Mitchell's qualifications to provide a standard-of-care opinion as to Dr. Balasubramanian. We rejected that argument above and reject this reiteration for the same reason.

15

Next, we address Dr. Balasubramanian's assertion that Dr. Mitchell's report insufficiently addresses Dr. Balasubramanian's breach of the standard of care. The section of Dr. Mitchell's report concerning Dr. Balasubramanian's breach of the standard of care states:

> An attending physician, and certainly an internist must be aware that an infected foot in the presence of a foreign body in a diabetic patient is a surgical emergency. Ms. Milner should have undergone surgical exploration with removal of the foreign body and wide surgical debridement as soon as possible after her March 22nd admission to the hospital, and within 24 hours at the latest. Dr. Balasubramanian breached the standard of care by waiting until March 24, 2015 to request a consult with a surgeon. The delay in getting Ms. Milner to surgery put her entire leg at risk for amputation and was a proximate cause of the great toe amputation, as well as, her long and protracted recovery and hospitalization. This is because diabetic foot wounds are known to rapidly deteriorate. By the time Dr. Balasubramanian referred Ms. Milner to surgery, her wound had become more necrotic and difficult to manage.
>
> After the March 25, 2015 surgery, it does not appear from the medical records that Dr. Balasubramanian examined the wound until March 30, 2015 when Ms. Milner was scheduled to be discharged. At that point, it was discovered that Ms. Milner had a gangrenous diabetic left foot infection. Dr. Balasubramanian breached the standard of care by failing to follow-up and assess the condition of the wound. The lack of physician follow-up following surgery put Ms. Milner's entire leg at risk for amputation and was a proximate cause of the great toe amputation, as well as, her long and protracted recovery and hospitalization. As stated above, diabetic foot wounds can, and do, rapidly deteriorate and must be managed in a timely and effective way with tissue debridement, inflammation and infection control, and moisture balance. A physician cannot simply abandon the patient following surgery and hope for the best.
>
> On March 23, 2015 it was noted that Ms. Milner's pulse in the affected left foot was difficult to palpate. At this time, Dr. Balasubramanian

should have called into question Ms. Milner's vascular status given her history of diabetes and ordered a vascular consult. This was critical to prevent any complications associated with ischemia. Dr. Balasubramanian breached the standard of care by waiting until March 30, 2015 to order a vascular consult. This too put Ms. Milner's entire leg at risk for amputation and was a proximate cause of the great toe amputation, as well as, her long and protracted recovery and hospitalization. This is because treating any severe ischemia is critical to wound healing, regardless of other interventions. Early referral to a vascular specialist likely would have resulted in earlier arterial reconstruction to improve blood flow and improve healing of the wound, which would have substantially reduced the risk of amputation.

Timely and effective wound management in this case, as described above, likely would have prevented the need for amputation of Vickie Milner's great toe.

In summary, Dr. Mitchell opined that Dr. Balasubramanian: (1) failed to timely consult with a surgeon so that Milner could have undergone surgical exploration, with removal of the foreign body and wide surgical debridement, within 24 hours of admission; (2) failed to request a vascular consult when the pulse in Milner's affected foot was difficult to palpate; and (3) failed to follow up and assess the condition of the wound in the five days between surgery and her scheduled discharge.

Regarding Dr. Mitchell's opinion that Dr. Balasubramanian breached the standard of care by failing to obtain a surgical consultation until two days after Milner's admission, Dr. Balasubramanian asserts that the medical records reflect that he ordered the surgical consultation "within the relevant timeframe." As stated above, our review of the adequacy of Dr. Mitchell's report is limited to the four

corners of his report. *Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 878. The court's role is not to determine the truth or falsity of the expert's opinion, or the facts upon which the expert bases such opinions, but to act as a gatekeeper in evaluating the sufficiency of the report itself. *Mettauer*, 326 S.W.3d at 691. Further, a "court may not consider an expert's credibility, the data relied upon by the expert, or the documents that the expert failed to consider at this pre-discovery stage of the litigation." *Curnel v. Houston Methodist Hosp.-Willowbrook*, 562 S.W.3d 553, 562 (Tex. App.—Houston [1st Dist.] 2018, no pet.). Thus, at this preliminary stage, a court does not determine an alleged factual dispute about the underlying medical records or the health care at issue. *See id.*; *Holt v. Holt*, No. 01-17-00008-CV, 2017 WL 3483211, at *3 (Tex. App.—Houston [1st Dist.] Aug. 15, 2017, pet. denied) (mem. op.); *Mettauer*, 326 S.W.3d at 690–92; *see also Hood v. Kutcher*, No. 01-12-00363-CV, 2012 WL 4465357, at *4 (Tex. App.—Houston [1st Dist.] Sept. 27, 2012, no pet.) (mem. op.) ("Whether an expert's factual inferences made in the expert report are accurate is a question for the fact finder and should not be considered when ruling on a section 74.351 motion to dismiss."); *Gannon v. Wyche*, 321 S.W.3d 881, 885–93 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (rejecting argument that expert should not be allowed to rely on plaintiff's statement that allegedly was "contrary to actual facts in the medical records"); *id.* at 892 ("Accepting the premise that an expert's report may not contradict the medical

18

records in such a case would preclude a plaintiff from ever being able to satisfy the expert-report requirement.").

Dr. Mitchell's opinion is that Milner's infected foot was a surgical emergency, that she needed surgery within 24 hours at the latest, and that Dr. Balasubramanian breached the standard of care by failing to obtain a surgical consultation until two days after Milner's admission. Dr. Mitchell concluded or inferred from the medical records that Dr. Balasubramanian ordered a surgical consultation with Dr. Nguyen on March 24, 2015, two days after Milner was admitted to the Medical Center.

Dr. Balasubramanian next contends that Dr. Mitchell does not describe how Dr. Balasubramanian failed to follow up and assess the condition of Milner's wound after the March 25 surgery. We disagree; according to Dr. Mitchell's report, after the March 25 surgery, "it does not appear from the medical records that Dr. Balasubramanian examined the wound until March 30, 2015 when Ms. Milner was scheduled to be discharged. At that point, it was discovered that Ms. Milner had a gangrenous diabetic left foot infection."

Lastly, Dr. Balasubramanian asserts that Dr. Mitchell's opinion that Dr. Balasubramanian failed to request a vascular consult is too vague because of Dr. Mitchell's statement that if "there is any doubt regarding diagnosis of peripheral vascular disease, the patient should be referred to a specialist for a full vascular

assessment." But a court reviews the report "in its entirety," *Baty*, 543 S.W.3d at 695, and Dr. Mitchell clarifies later in his report:

> On March 23, 2015 it was noted that Ms. Milner's pulse in the affected left foot was difficult to palpate. At this time, Dr. Balasubramanian should have called into question Ms. Milner's vascular status given her history of diabetes and ordered a vascular consult. This was critical to prevent any complications associated with ischemia. Dr. Balasubramanian breached the standard of care by waiting until March 30, 2015 to order a vascular consult.

"More detail" is not required at this stage. *See id.* at 696; *Lee*, 2018 WL 4923938, at *5. Dr. Mitchell's report sufficiently identifies the "conduct being called into question." *Baty*, 543 S.W.3d at 697; *see Palacios*, 46 S.W.3d at 875. Dr. Mitchell's report on the standard of care and its breaches informs Dr. Balasubramanian of the specific conduct being called into question and provided the trial court with a basis to conclude that Milner's claim has merit; it therefore satisfies the good-faith effort required by the statute. *See id.* We overrule Dr. Balasubramanian's second issue.

**Cypress Fairbanks Medical Center.** In its sole issue, the Medical Center contends in part that Dr. Mitchell's report failed to provide the necessary fair summary of the standard of care applicable to its nursing staff and the breach of the standard of care. Regarding the standard of care applicable to the Medical Center's nursing staff and its breach, Dr. Mitchell's report states:

> After surgical debridement *frequent wound assessment and bacterial control and moisture balance is required* to prevent maceration.

20

Additionally, infection control and restoring pulsatile blood flow is critical for healing of the wound. This requires a team approach. A physician may only see the patient once or twice per day and relies on the wound care nursing staff to *document the condition of the wound*. *Documentation* of the size of the wound *is important* to determine if the wound is healing and the treatment plan is working. Recording the size, depth, appearance and location of the wound establishes a baseline for treatment, and monitoring any response to interventions. The wound care nursing staff *must notify physicians* if the wound is deteriorating. Debridement may be a one-off procedure or it may need to be ongoing for maintenance of the wound bed. The requirement for further debridement should be determined after each dressing change. This can only occur with *prompt communication* between the wound care nursing team and the treating physicians. Once the wound progresses to the state of gangrene, it is often too late to curb life threatening infection without amputation of the affected limb.

. . . .

In the days following the March 25th surgery *there appears to have been little or no documented wound care or follow-up of the condition of the wound*. The nurses and wound technicians at Cypress Fairbanks Medical Center *breached the standard of care by failing to timely provide wound care and assessment* following the March 25, 2015 surgery, *and by failing to timely report the declining condition of Ms. Milner's wound to physicians* allowing same to become gangrenous by March 30, 2015. The *failure to timely provide wound care and alert physicians of the declining condition of the wound* following the March 25, 2016 surgery put Ms. Milner's entire leg at risk for amputation and *was a proximate cause of the great toe amputation, as well as, her long and protracted recovery and hospitalization*. This is because diabetic foot wounds can, and do, rapidly deteriorate in light of diabetic changes, such as neuropathy and vascular disease. Once the wound progresses to the state of gangrene, it is often too late to curb life threatening infection without amputation of the affected limb. Therefore, the wound must be managed in a timely and effective way with tissue debridement, inflammation and infection control, and moisture balance. This requires a team approach, including prompt communication with the treating physicians when the wound is not healing as desired. Timely and effective wound management, including

21

communication with physicians when the wound was declining, likely would have prevented the need for amputation of Ms. Milner's great toe. [Emphases added.].

"The standard of care is defined by what an ordinarily prudent healthcare provider would have done under the same or similar circumstances." *Clavijo*, 2018 WL 2976116, at *13 (citing *Palacios*, 46 S.W.3d at 880); *see Peabody v. Manchac*, No. 14-17-00646-CV, — S.W.3d —, —, 2018 WL 6836864, at *3 (Tex. App.— Houston [14th Dist.] Dec. 27, 2018, no pet. h.).

The Medical Center argues that Dr. Mitchell's opinion on the applicable standard of care and its breach lacks the specificity and detail required to satisfy the fair-summary standard. We disagree. Dr. Mitchell opined that the Medical Center's nursing staff should have: (1) performed frequent wound assessment; (2) documented the condition of the wound; and (3) promptly notified physicians if the wound was deteriorating. Dr. Mitchell then opined that the Medical Center nurses and wound technicians breached the standard of care by (1) failing to timely provide wound care and assessment; (2) failing to document the condition of the wound; and (3) failing to timely report the declining condition of the wound to physicians. Dr. Mitchell's opinions are supported by his statement that, from the medical records, "there appears to have been little or no documented wound care or follow-up of the condition of the wound" in the days following the March 25 surgery

and by the fact that Milner's wound had become gangrenous by March 30, which was discovered only as she was being discharged and picked up by her daughter.

Dr. Mitchell could infer the standard-of-care breaches from the lack of documentation in the medical records and the gangrenous condition on March 30. *See Hood*, 2012 WL 4465357, at *5–6 (holding expert could infer from lack of documentation in medical records that thorough wound cleaning did not occur and breached standard of care); *Azle Manor, Inc. v. Vaden*, No. 02-08-00115-CV, 2008 WL 4831408, at *6 (Tex. App.—Fort Worth Nov. 6, 2008, no pet.) (mem. op.) (holding expert could draw inferences from what was not in patient's medical records), *overruled in part on other grounds by Certified EMS, Inc. v. Potts*, 392 S.W.3d 625 (Tex. 2013); *see also Bay Oaks SNF, LLC v. Lancaster*, 555 S.W.3d 268, 273–74, 280–84 (Tex. App.—Houston [1st Dist.] 2018, pet. filed) (affirming trial court's approval of expert report that relied in part on lack of documentation of required care to prevent pressure ulcers).

The Medical Center further argues that Dr. Mitchell's report *could* have provided more detail:

> What is 'timely' under the circumstances? What sort of 'wound' care should the nurses have provided? How often should Cypress Fairbank's staff have been assessing the wound? Who should have reported the wound's condition to the physicians, and when should they have reported it?

But as Milner also correctly points out, in *Hood*, a similar wound-care case, this court rejected similar complaints. *See Hood*, 2012 WL 4465357, at \*3–7. And as the supreme court stated in *Baty*, while an expert report can arguably provide "an additional degree of specificity," "[a]dditional detail is simply not required at this stage of the proceedings." *Baty*, 543 S.W.3d at 697 & n.10; *see Lee*, 2018 WL 4923938, at \*5.

Dr. Mitchell's report on the standard of care and its breach gave the trial court a sufficient basis to reasonably conclude that Milner's claims against the Medical Center have merit and advised the Medical Center of the conduct that Milner, through her expert, has called into question. *Baty*, 543 S.W.3d at 697; *Palacios*, 46 S.W.3d at 875. We overrule those portions of the Medical Center's sole issue.

**Causation**

Dr. Balasubramanian, Dr. Nguyen, and the Medical Center each contend that Dr. Mitchell's report on causation is inadequate.

For causation, the expert report must explain "how and why" the physician's or healthcare provider's breach proximately caused the plaintiff's injury. *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 459–60 (Tex. 2017). "In satisfying this 'how and why' requirement, the expert need not prove the entire case or account for every known fact; the report is sufficient if it makes 'a good-faith

24

effort to explain, factually, how proximate cause is going to be proven.'" *Abshire*, 563 S.W.3d at 224 (quoting *Zamarripa*, 526 S.W.3d at 460).

> The report need not use the words "proximate cause," "foreseeability," or "cause in fact." "[A] report's adequacy does not depend on whether the expert uses any particular 'magical words.'"
>
> . . . .
>
> Proximate cause has two components: (1) foreseeability and (2) cause-in-fact. For a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission—*i.e.*, but for the act or omission—the harm would not have occurred.
>
> This is the causal relationship between breach and injury that an expert report must explain to satisfy the Act.

*Zamarripa*, 526 S.W.3d at 460 (footnoted citations omitted).

A causation opinion must provide a "straightforward link" between the alleged breach of the standard of care and the claimed injury. *See Abshire*, 563 S.W.3d 225. The court's role is to determine whether the expert has explained how the negligent conduct caused the injury. *Id.* at 226.

**Dr. Balasubramanian.** In his third issue, Dr. Balasubramanian contends that Dr. Mitchell's report on causation is insufficient because it is "speculative, contains analytical gaps in its causal links, and relies on assumptions." He also contends that Dr. Mitchell's report only suggests that Milner's amputation was preventable, that it impermissibly "works backward" from a bad outcome to establish causation, and that it fails to exclude other possible causes. In short, Dr. Balasubramanian argues

that Dr. Mitchell does not tie Dr. Balasubramanian's alleged breaches to the outcome, resulting in an "impermissible analytical gap" and lack of sufficient specificity to inform Dr. Balasubramanian of how his alleged breaches caused the outcome.

The supreme court does not use the term "analytical gap" in the context of section 74.351 expert reports, but it has noted that some courts of appeals do.[3] *Abshire*, 563 S.W.3d at 225, n.10.

> It appears that the courts have generally used this term to mean a failure to link the breach of the standard of care to the injury, which comports with this Court's discussion of chapter 74's expert report requirements with respect to causation. *See Zamarripa*, 526 S.W.3d at 460 (holding that an expert report sufficiently addresses causation where it "explain[s] the basis of [the expert's] statements to link [the] conclusions to the facts").

*Id.* We will follow the supreme court and decline to analyze the causation issue with the term "analytical gap."

Dr. Balasubramanian's assertion that Dr. Mitchell's report has a fatal one-week gap concerning Milner's care between March 25 and March 30 is premature. *Cf. Puppula*, 564 S.W.3d at 201 ("But the absence of an opinion stating with specificity at what point in the continuum of disease progression an intervention

---

[3]    The term arose from and is used in the area of expert-opinion reliability. *See Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 726–27 (Tex. 1998) (deeming expert testimony unreliable when "there is simply too great an analytical gap between the data and the opinion proffered").

would have proven timely does not cause these experts' causation opinion to be conclusory at this early stage of evaluation."). Further, Dr. Mitchell was not required to exclude or rule out other possible causes of Milner's injuries in his expert report. *Curnel*, 562 S.W.3d at 562 (quoting *Baylor Med. Ctr v. Wallace*, 278 S.W.3d 552, 562 (Tex. App.—Dallas 2009, no pet.) ("Nothing in section 74.351 suggests the preliminary report is required to rule out every possible cause of the injury, harm, or damages claimed.")).

Regarding Dr. Balasubramanian's alleged failure to timely consult with a surgeon so that Milner could have undergone surgery within 24 hours of admission, Dr. Mitchell's report explains "how and why" this failure caused the amputation of her great toe. It first states that a diabetic patient's foot infection is a "surgical emergency" that requires surgical treatment within 24 hours because "diabetic foot wounds are known to rapidly deteriorate." "Without early intervention, the wound can rapidly deteriorate, leading to amputation of the affected limb. Therefore, it is at this crucial early stage that physicians have the potential to curb what is often progression from mild infection to a more severe problem, with necrosis, gangrene and often amputation."

As a result, Dr. Mitchell then opines, the "delay in getting Ms. Milner to surgery put her entire leg at risk for amputation and was a proximate cause of the great toe amputation, as well as, her long and protracted recovery and

hospitalization."[4] To further support his opinion that Dr. Balasubramanian's delayed surgical consultation was a cause of the great-toe amputation, Dr. Mitchell notes that at the time of the allegedly delayed surgery, the "dorsal tissue on the plantar aspect of the great toe was found to be blackish" by the surgeon, Dr. Nguyen. Dr. Mitchell concludes that Dr. Balasubramanian's breach "was a proximate cause of Ms. Milner's amputation and long and protracted recovery and hospitalization. I am of the medical opinion that Ms. Milner more likely than not would not have required amputation and extended hospitalization with prompt and proper care and assessment of the wound as described above."

Dr. Mitchell sufficiently addresses foreseeability. In explaining why a diabetic's foot infection with a foreign body is a surgical emergency, he states that "diabetic foot wounds are known to rapidly deteriorate," further explaining that this is "because the development and progression of the infected wound is often complicated by diabetic changes, such as neuropathy and vascular disease."

Dr. Mitchell sufficiently describes the causal relationship because he explains the factual basis for his opinions and he links Dr. Balasubramanian's alleged conduct—the delayed surgical consultation—with Milner's subsequent development of gangrene and the amputation. *See Peabody*, — S.W.3d at —, 2018

---

[4]     While not required, *see Zamarripa*, 526 S.W.3d at 460, Dr. Mitchell's report contains and relies on an accurate definition of proximate cause.

WL 6836864, at *7, 14; *Clavijo*, 2018 WL 2976116, at *11; *Holt*, 2017 WL 3483211, at *4; *Hood*, 2012 WL 4465357, at *6. This causation opinion provides the "how and why" and a "straightforward link" between the alleged breach of the standard of care and the claimed injury. *See Abshire*, 563 S.W.3d at 225; *Peabody*, — S.W.3d at —, 2018 WL 6836864, at *7, 14.

Regarding Dr. Balasubramanian's alleged failure to request a vascular consultation when the pulse in Milner's affected foot was difficult to palpate on March 23, Dr. Mitchell's report explains that this "too put Ms. Milner's entire leg at risk for amputation and was a proximate cause of the great toe amputation, as well as, her long and protracted recovery and hospitalization." As part of foreseeability, he explains why: "[T]reating any severe ischemia is critical to wound healing, regardless of other interventions. Early referral to a vascular specialist likely would have resulted in earlier arterial reconstruction to improve blood flow and improve healing of the wound, which would have substantially reduced the risk of amputation." And again, his report states elsewhere that "the development and progression of the infected wound is often complicated by diabetic changes, such as neuropathy and vascular disease."

Dr. Mitchell sufficiently describes the causation element pertaining to Dr. Balasubramanian's alleged failure to request a vascular consultation. Dr. Mitchell explains the factual basis for his opinions and links Dr. Balasubramanian's failure

to request a vascular consultation with Milner's subsequent development of gangrene and the amputation. *See Peabody*, — S.W.3d at —, 2018 WL 6836864, at *14 (concluding "it is reasonable to anticipate the consulting specialist doctor would comply with the standard of care"). This causation opinion likewise provides the "how and why" and a "straightforward link" between the alleged breach of the standard of care and the claimed injury.[5]

Because Dr. Mitchell's expert report adequately links his conclusions with the underlying facts, the trial court could have reasonably concluded that it constitutes an objective, good-faith effort to provide a fair summary of his opinions with respect to the causal relationship between Dr. Balasubramanian's alleged breaches and Milner's injury. *See Abshire*, 563 S.W.3d at 225–26; *Peabody*, — S.W.3d at —, 2018 WL 6836864, at *7, 14. We overrule Dr. Balasubramanian's third issue.

**Dr. Nguyen.** In his sole issue, Dr. Nguyen asserts that Dr. Mitchell's causation opinions are conclusory and contain an "analytical gap" or "missing link." Dr. Mitchell's standard-of-care and causation opinions as to Dr. Nguyen are as follows:

---

[5] If an expert report adequately addresses at least one liability theory, it satisfies the statutory requirements. *See Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630–32 (Tex. 2013). Because we have found two of Milner's negligence theories in Dr. Mitchell's expert report against Dr. Balasubramanian to be adequate, we need not further address the allegation that Dr. Balasubramanian failed to follow up and assess the condition of the wound in the five days between surgery and Milner's scheduled discharge.

Dr. Nguyen noted in his March 25, 2015 operative report that due to her diabetes, Ms. Milner was at high risk for possibly eventually losing her toes due to poor circulation. Nevertheless, he breached the standard of care by failing to refer her to [a] vascular specialist to manage any ischemia. This put Ms. Milner's entire leg at risk for amputation and was a proximate cause of the great toe amputation, as well as, her long and protracted recovery and hospitalization. This is because treating any severe ischemia is critical to wound healing, regardless of other interventions. Early referral to a vascular specialist likely would have resulted in earlier arterial reconstruction to improve blood flow and improve healing of the wound, which would have substantially reduced the risk of amputation.

Between March 25th and March 30th (following the debridement procedure) it does not appear from the medical records that Dr. Nguyen ever examined the wound. On March 30, 2015, it was discovered that Ms. Milner had a gangrenous diabetic left foot infection. Dr. Nguyen breached the standard of care by failing to follow-up and assess the condition of the wound. The lack of physician follow-up following surgery put Ms. Milner's entire leg at risk for amputation and was a proximate cause of the great toe amputation, as well as, her long and protracted recovery and hospitalization. This is because diabetic foot wounds can, and do, rapidly deteriorate and must be managed in a timely and effective way with tissue debridement, inflammation and infection control, and moisture balance. Frequent wound assessment and bacterial control and moisture balance is required to prevent maceration. Debridement may need to be repeated for maintenance of the wound bed. The requirement for further debridement should be determined after each dressing change. A physician cannot simply abandon the patient following surgery and hope for the best. Timely and effective wound management in this case likely would have prevented the need for amputation of Ms. Milner's great toe.

Dr. Nguyen relies on *Humble Surgical Hospital, LLC v. Davis*, 542 S.W.3d 12 (Tex. App.—Houston [14th Dist.] 2017, pet. filed), to support his causation

argument. We find this opinion unpersuasive for several reasons.[6] First, it largely relies on the "analytical gap" argument in the Beaumont Court's opinion in *Abshire*, which has been reversed. *Id.* at 23–26 (citing *HealthSouth Rehabilitation Hosp. of Beaumont, LLC v. Abshire*, 561 S.W.3d 193, 214–17 (Tex. App.—Beaumont 2017), *rev'd*, 563 S.W.3d 219 (Tex. 2018)). It is therefore questionable whether the Fourteenth Court's opinion in *Humble Surgical* comports with the supreme court's direction in *Abshire* on the review of causation reports:

> Dr. Rushing explained how the nurses' breach—failing to consistently document Abshire's OI, particularly in light of her continued complaints of back pain—caused a delay in diagnosis and proper treatment and why that delay caused the issues that led to Abshire's paraplegia. Thus, the report adequately explained the links in the causal chain.
>
> Despite this identified causal link, the court of appeals held that the report was conclusory because it "fail[ed] to explain how the nurses' alleged failure to document OI was a substantial factor in causing or exacerbating Abshire's injuries . . . or that it would have changed the outcome." 562 S.W.3d at 217. Specifically, the court observed that the physicians did not order tests or provide spinal treatment on either the November 22 or 23 visits, even though Abshire's OI was noted during these visits. *See id.* at —. Therefore, the court held that Dr. Rushing's "opinion that the nurses' failure to chart Abshire's history of OI caused Abshire's injury rests on an analytic gap that renders his causation opinion as to the nurses conclusory." *Id.* at 201.
>
> We disagree that such an analytic gap exists. As explained above, Dr. Rushing's report adequately links his conclusion with the

---

[6] The plaintiff's petition for review in *Humble Surgical* is pending before the supreme court, and briefing on the merits was requested and has been completed. *See Davis v. Humble Surgical Hosp., LLC*, No. 18-0092 (Tex.), Petition for Review, filed Feb. 2, 2018.

32

underlying facts (failure to properly document Abshire's medical history was a substantial factor in her delayed treatment and subsequent injury). Rather, it appears the court of appeals simply did not agree with his conclusions in light of Abshire's overall course of treatment. However, the court's job at this stage is not to weigh the report's credibility; that is, the court's disagreement with the expert's opinion does not render the expert report conclusory.

. . . .

In the same vein, with respect to causation, the court's role is to determine whether the expert has explained how the negligent conduct caused the injury. Whether this explanation is believable should be litigated at a later stage of the proceedings.

The ultimate evidentiary value of the opinions proffered by Dr. Rushing and Nurse Aguirre is a matter to be determined at summary judgment and beyond. In this regard, the court of appeals improperly examined the merits of the expert's claims when it identified what it deemed an "analytical gap."

*Abshire*, 563 S.W.3d at 225–26 (footnote omitted).

Additionally, *Peabody*, a subsequent Fourteenth Court opinion that applied the supreme court's *Abshire* opinion, is persuasive. *See Peabody*, — S.W.3d at —, 2018 WL 6836864, at *6, 8–11 ("The Texas Supreme Court recently approved a causation opinion in a similar expert report . . . . We look to the cases relied on by St. Luke's with this more recent test in mind.") (citing *Abshire*, 563 S.W.3d at 225–26). *Peabody*, which similarly involved alleged delay in treatment, concluded that the experts' causation opinions met the test in *Abshire*. *See id.*, — S.W.3d at —, 2018 WL 6836864, at *8–14.

We have addressed Dr. Mitchell's causation opinion as to Dr. Balasubramanian's alleged failure to request a vascular consultation. For the same reasons, we conclude that Dr. Mitchell's causation opinion as to Dr. Nguyen constitutes an objective, good-faith effort to provide a fair summary of his opinions with respect to the causal relationship between Dr. Nguyen's alleged breach and Milner's injury.[7] We overrule Dr. Nguyen's sole issue.

**Cypress Fairbanks Medical Center.** The Medical Center contends in the last part of its sole issue that Dr. Mitchell's report failed to explain how its nursing staff caused Milner's injury.

Dr. Mitchell's report states the following on causation as to the Medical Center:

> In the days following the March 25th surgery there appears to have been little or no documented wound care or follow-up of the condition of the wound. The nurses and wound technicians at Cypress Fairbanks Medical Center breached the standard of care by failing to timely provide wound care and assessment following the March 25, 2015 surgery, and by failing to timely report the declining condition of Ms. Milner's wound to physicians allowing same to become gangrenous by March 30, 2015. *The failure to timely provide wound care and alert physicians of the declining condition of the wound following the March 25, 2016 surgery put Ms. Milner's entire leg at risk for amputation and was a proximate cause of the great toe amputation, as well as, her long and protracted recovery and hospitalization. This is because diabetic foot wounds can, and do, rapidly deteriorate in light of diabetic*

---

[7] As we did with Dr. Balasubramanian, we similarly need not address Dr. Nguyen's causation argument on his alleged failure to follow up and assess the condition of the wound in the five days between surgery and Milner's scheduled discharge.

*changes, such as neuropathy and vascular disease.* Once the wound progresses to the state of gangrene, it is often too late to curb life threatening infection without amputation of the affected limb. Therefore, the wound must be managed in a timely and effective way with tissue debridement, inflammation and infection control, and moisture balance. This requires a team approach, *including prompt communication with the treating physicians when the wound is not healing as desired. Timely and effective wound management, including communication with physicians when the wound was declining, likely would have prevented the need for amputation of Ms. Milner's great toe*. [Emphases added.].

Regarding the Medical Center's standard of care, Dr. Mitchell's report states the following, which also pertains to causation:

*A physician* may only see the patient once or twice per day and *relies on the wound care nursing staff to document the condition of the wound.* Documentation of the size of the wound is important to determine if the wound is healing and the treatment plan is working. Recording the size, depth, appearance and location of the wound establishes a baseline for treatment, and monitoring any response to interventions. *The wound care nursing staff must notify physicians* if the wound is deteriorating.

Debridement may be a one-off procedure or it may need to be ongoing for maintenance of the wound bed. The requirement for further debridement should be determined *after each dressing change. This can only occur with prompt communication between the wound care nursing team and the treating physicians*. Once the wound progresses to the state of gangrene, it is often too late to curb life threatening infection without amputation of the affected limb. [Emphases added.].

Dr. Mitchell concludes: "It is my opinion that Cypress Fairbanks Medical Center failed to use ordinary care in its treatment of Vickie Milner by failing to provide timely and appropriate wound care and wound assessment; and by failing to alert physicians of the declining condition of the wound." He then includes the

35

Medical Center with the physicians in his causation conclusion, stating that the Medical Center's negligence (breach) "was a proximate cause of Ms. Milner's amputation and long and protracted recovery and hospitalization. I am of the medical opinion that Ms. Milner more likely than not would not have required amputation and extended hospitalization with prompt and proper care and assessment of the wound *as described above*." (Emphasis added).

Specifically, the Medical Center asserts that Dr. Mitchell's report (1) does not explain how the nursing staff's providing wound care would have halted the progress of Milner's infection; (2) does not explain how the nursing staff would have anticipated that, as a result of their failure to provide proper wound care and management, the physicians would not themselves evaluate and manage Milner's wound; (3) does not explain how alerting physicians would have changed the outcome and prevented Milner's toe amputation; (4) does not show at what point in the timeline that alerting physicians would have allowed them to intervene to prevent the amputation; (5) does not explain how additional information from the nursing staff would have led the physicians to curb the progression of Milner's infection if the physicians already had that information; and (6) requires the court to assume that the nursing staff's communication to a physician would have caused the physician to take action that would have prevented the amputation.

The Medical Center contends that Dr. Mitchell does not explain how wound care would have halted the progression of Milner's infection, and it makes the related contention that his report does not explain how alerting physicians would have changed the outcome and prevented Milner's toe amputation. We disagree; his report states:

> Without early intervention, the wound can rapidly deteriorate, leading to amputation of the affected limb. Therefore, it is at this crucial early stage that physicians have the potential to curb what is often progression from mild infection to a more severe problem, with necrosis, gangrene and often amputation.
>
> . . . .
>
> Documentation of the size of the wound is important to determine if the wound is healing and the treatment plan is working. Recording the size, depth, appearance and location of the wound establishes a baseline for treatment, and monitoring any response to interventions. *The wound care nursing staff must notify physicians* if the wound is deteriorating.
>
> . . . .
>
> [D]iabetic foot wounds can, and do, rapidly deteriorate in light of diabetic changes, such as neuropathy and vascular disease. Once the wound progresses to the state of gangrene, it is often too late to curb life threatening infection without amputation of the affected limb. Therefore, the *wound must be managed in a timely and effective way with tissue debridement, inflammation and infection control, and moisture balance*. This requires a team approach, including prompt communication with the treating physicians when the wound is not healing as desired. *Timely and effective wound management, including communication with physicians when the wound was declining, likely would have prevented the need for amputation of Ms. Milner's great toe*. [Emphases added].

The Medical Center makes another related argument that Dr. Mitchell does not explain when alerting Milner's physicians would have allowed them to intervene to prevent the amputation. But as we have already noted, the absence of such an opinion in an expert report at this early stage does not render the report deficient. *See Puppala*, 564 S.W.3d at 201.

Next, and relying in part on *Curnel*, the Medical Center contends that Dr. Mitchell does not explain how the nursing staff would have anticipated that, as a result of their failure to provide proper wound care and management, the physicians themselves would not evaluate and manage Milner's wound, especially since Dr. Mitchell states that "physicians have the potential to curb what is often progression from mild infection to a more severe problem, with necrosis, gangrene and often amputation." Dr. Mitchell's report does explain this alleged omission. He states that wound care and management is a "team approach," that the wound care nursing staff should document the "size, depth, appearance and location of the wound" and monitor the wound's response to interventions, and that the physician "relies on the wound care nursing staff to document the condition of the wound." As for *Curnel*, it is inapposite because it concluded that the causation report was deficient on cause-in-fact because the report stated that the subsequent treating physicians did have the additional information that the nursing staff allegedly failed to provide to them so that they could make the correct diagnosis. *See Curnel*, 562 S.W.3d at 567–68. And

*Christus Health Gulf Coast v. Davidson*, No. 15-15-00643-CV, 2016 WL 2935715, at *5 (Tex. App.—Houston [14th Dist.] May 17, 2016, no pet.) (mem. op.), also relied on by the Medical Center, is inapposite for the same reason.

The Medical Center's last argument relating to the nursing staff's alleged failure to alert and how it would have changed the outcome is that Dr. Mitchell's opinion requires the court to assume that the nursing staff's communication to a physician would have caused the physician to take action that would have prevented the amputation.[8] *Peabody* addressed a similar argument, concluding "it is reasonable to anticipate the consulting specialist doctor would comply with the standard of care." *Peabody*, — S.W.3d at —, 2018 WL 6836864, at *14. Dr. Mitchell plainly states how timely communication of wound deterioration to the physician and early intervention could have prevented amputation, explaining that at the crucial early stage, "physicians have the potential to curb what is often progression from mild infection to a more severe problem, with necrosis, gangrene and often amputation."

Dr. Mitchell's causation opinions as to the Medical Center are similar to his causation opinions as to Dr. Balasubramanian, which we have found sufficient. For the same reasons, we conclude that Dr. Mitchell sufficiently describes the causation element as to the Medical Center: Dr. Mitchell explains the factual basis for his opinions and he links the Medical Center nursing staff's alleged conduct—failing to

---

[8]     This argument largely relies on *Humble Surgical*, which is addressed above.

39

provide timely and appropriate wound care and wound assessment and failing to alert physicians of the declining condition of the wound—with Milner's subsequent development of gangrene and the amputation. *See Peabody*, — S.W.3d at —, 2018 WL 6836864, at *7; *Clavijo*, 2018 WL 2976116, at *11; *Holt*, 2017 WL 3483211, at *4; *Hood*, 2012 WL 4465357, at *6. Dr. Mitchell's causation opinions provide the "how and why" and a "straightforward link" between the alleged breach of the standard of care and the claimed injury. The trial court could have reasonably concluded that his report constitutes an objective, good-faith effort to provide a fair summary of his opinions with respect to the causal relationship between the Medical Center's alleged breaches and Milner's injury. *See Abshire*, 563 S.W.3d at 225–26; *Peabody*, — S.W.3d at —, 2018 WL 6836864, at *7; *Puppala*, 564 S.W.3d at 200–01. We overrule this last portion of the Medical Center's sole issue.

**Conclusion**

We affirm the orders of the trial court.

Richard Hightower
Justice

Panel consists of Justices Lloyd, Kelly, and Hightower.