**Opinion issued July 23, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-23-00524-CV**
_____

**SHILPA THAKKAR PANKAJ, M.D., PEEKABOO PEDIATRICS, AND MEMORIAL HERMANN HEALTH SYSTEM D/B/A MEMORIAL HERMANN GREATER HEIGHTS HOSPITAL, Appellants**

**V.**

**EVA HERNANDEZ, INDIVIDUALLY AND AS NEXT FRIEND OF MINOR CHILD J.H., Appellee**

---

**On Appeal from the 11th District Court**
**Harris County, Texas**
**Trial Court Case No. 2021-47717**

---

## O P I N I O N

This accelerated interlocutory appeal arises out of a medical malpractice lawsuit filed by Eva Hernandez, individually and as next friend of her infant son, in which she alleges her son sustained a severe brain injury due to the negligence of

multiple defendants who cared for them before, during, and after her son's birth. Among other defendants, Hernandez sued Memorial Hermann Health System, doing business as Memorial Hermann Greater Heights Hospital, which employed the nurses who cared for her during labor and delivery and afterward. Hernandez also sued Shilpa Thakkar Pankaj, M.D., a pediatrician who cared for Hernandez's son soon after he was born, as well as Pankaj's medical practice, Peekaboo Pediatrics.

As required by the Texas Medical Liability Act, Hernandez served these three defendants with a preliminary expert report by Robert D. Eden, M.D. These three defendants, in turn, objected to Eden's report, requesting dismissal of Hernandez's claims against them and attorney's fees under the Act. In their respective objections, one filed by Pankaj and Peekaboo Pediatrics and another filed by Memorial Hermann, these defendants argued Eden's report was insufficient in various ways.

The trial court denied the objections, and these three defendants appeal.

We affirm the trial court's order denying Memorial Hermann's objection to Eden's expert report. But we set aside the trial court's order denying Pankaj and Peekaboo Pediatrics' objection to Eden's report. We remand this cause to the trial court for further proceedings consistent with our opinion, including the entry of an order dismissing Hernandez's claims against Pankaj and Peekaboo Pediatrics and awarding reasonable and necessary attorney's fees to these two defendants.

## BACKGROUND

In her live pleading, Hernandez alleges she was admitted to Memorial Hermann Greater Heights Hospital for labor and delivery. Several hours later, she further alleges, the fetus's heart rate indicated fetal distress. Despite its evident distress, the fetus was only delivered by cesarean section several additional hours later, too late to avoid a severe brain injury resulting from this negligent delay. Among the negligent acts Hernandez alleges, she maintains that the nurses failed to institute appropriate nursing care in response to the fetus's distress. She also alleges that, after her son was born, a blood-gas analysis should have been performed and his brain injury should have been treated, including through cooling techniques.

As required by the Texas Medical Liability Act, Hernandez timely served Pankaj, Peekaboo Pediatrics, and Memorial Hermann with a report by Dr. Eden.

Eden's report sets forth his credentials and qualifications. He has been a board-certified obstetrician-gynecologist and maternal-fetal-medicine specialist for more than two decades. Eden currently holds an academic position within the Department of Obstetrics and Gynecology, Division of Maternal-Fetal Medicine, at the Upstate Syracuse Campus of the State University of New York. This full-time academic employment regularly entails labor and delivery, in-patient treatment involving high-risk pregnancies, out-patient consultations regarding maternal-fetal-medicine consultation and ultrasounds, and the performance of administrative tasks.

3

In terms of his experience, Eden states that he has supervised nurses and residents in the labor and delivery care setting and has trained nurses in this area, including training them to interpret fetal heart rate tracings. As a result of his supervision and training of nurses and residents, Eden is familiar with the standards of care applicable to nurses, residents, and others concerning the provision of labor and delivery health care services. Eden further states that he is experienced in working with OB-GYN patients throughout pregnancy, during labor and delivery, and postpartum as well. In particular, he has extensive experience in fetal monitoring from the onset of labor through delivery and care of pregnant mothers. He states that he is experienced in the interpretation of fetal heart rate tracings, including those that display concerning fetal heart rate patterns, and in the care of newborns who show signs of oxygen deficiency. He has "cared for hundreds of patients who experienced problems of the fetus during labor and delivery like the ones experienced here."

Eden has published many peer-reviewed articles, including articles regarding testing prior to birth and fetal monitoring from the onset of labor through delivery.

In his report, Eden opines that sometime after Hernandez was admitted, fetal distress should have been apparent. In support of this conclusion, Eden relies on fetal heart rate tracings. One made before an epidural anesthetic was administered already showed cause for concern: decreased fetal heart rate variability, lack of accelerations, and variable decelerations. After the administration of the anesthetic,

4

Hernandez's blood pressure dropped and remained low for more than an hour. According to Eden, significant maternal low blood pressure of this sort is associated with inadequate oxygenation of the fetus due to decreased placental perfusion. In addition, a subsequent fetal heart rate tracing showed a prolonged deceleration with a slow return to baseline. Indeed, even after Hernandez's blood pressure returned to normal, the fetal heart rate remained concerning, including prolonged decelerations.

Eventually, hours after the fetus first showed signs of distress, Hernandez was taken to the operating room, where her son was delivered by cesarean section. Eden opines that she should have been moved to the operating room for an emergency cesarean section much sooner, given the signs of fetal distress, and that the failure to do so, among other things, caused the fetus to suffer a severe brain injury. Eden further opines that circumstances after delivery corroborate his opinion that oxygen deprivation resulting from delayed delivery caused the severe brain injury. In part, Eden relies on the infant's clinical presentation at birth, which included bluish or pale skin, weak cry, slow breathing, limpness or lack of movement, and poor reflexes. In addition, Eden relies on an MRI performed about 18 months after birth, which Eden maintains corroborates his causation opinion by showing intracerebral hemorrhage, hypoxic-ischemic encephalopathy, and encephalomalacia.

In general, Eden faults everyone involved in the labor, delivery, and post-birth care for the severe brain injury. With respect to the nurses in particular, Eden opines

5

that the standard of care required them to interpret fetal heart rate tracings, identify signs of fetal distress, and notify physicians of signs of fetal distress so that prompt measures could be undertaken to prevent harm to the fetus, including, if necessary, delivery by a cesarean section. Should physicians delay in undertaking these preventative measures, the nurses were then required to "go up the chain of command to report to his/her supervisor and/or another physician so that the hospital can provide an attending to conduct the emergency cesarean section." Eden asserts the nurses breached these standards by failing to recognize or notify physicians about signs of fetal distress that developed well before delivery, and, as a result, an emergency cesarean section was not performed soon enough to avoid the injury.

Eden also opines that the nurses breached the applicable standard of care in various other ways. For example, fetal and maternal heart rate data is not always available or clear, which he attributes to the nurses' failure to properly connect monitors or electrodes, an action necessary to ensure that correct fetal heart rate data is collected. Eden additionally faults the nurses for failing to recognize the clinical signs of hypoxia when the child was born and their corresponding failure to ensure that blood-gas testing was performed by physicians and their failure to cool the child.

In addition, Eden maintains that the standard of care applicable to the hospital itself required it to ensure that labor and delivery nurses can interpret fetal heart rate

tracings and recognize signs of fetal distress. Moreover, the hospital must also have policies as to what nurses are to do when they recognize signs of fetal distress.

With respect to Dr. Pankaj, Eden opines that the applicable standard of care required her to recognize the signs of hypoxia in a newborn and, when evident, to order blood-gas testing and whole-body cooling within six hours of birth. Because Pankaj took over the child's care within this six-hour period but failed to order blood-gas testing or whole-body cooling, she thereby breached the standard of care. According to Eden, these breaches "caused and exacerbated" the child's injuries.

Memorial Hermann filed an objection to Eden's expert report. In its objection, the hospital argued that the report was insufficient in three ways. First, it objected that Eden failed to show a breach of the standard of care by the hospital or its personnel. Second, the hospital objected that Eden's own recitation of facts refuted his opinion that the nurses breached the standard of care or caused the injury. Third, Memorial Hermann objected that Eden was not qualified to opine on the "standard of care in management of the neonate or timing or mechanism of injury."

Pankaj also filed an objection to Eden's expert report. In her objection, Pankaj argued that the report was insufficient in two ways. First, she argued that Eden failed to show that Pankaj or Peekaboo Pediatrics caused the child's severe brain injury. Second, she argued that Eden was not qualified to render expert opinions on the standard of care applicable to a pediatrician like herself or the standard's breach.

7

The trial court held a hearing on the objections to Eden's report. Toward the hearing's end, the trial court asked Hernandez's counsel: "Before I make a ruling, do you want 30 days or do you want me to rule?" Hernandez's counsel eventually replied that he would "take the 30 days." So, the trial court stated that it would grant Hernandez 30 days to address the complaints about Eden's report. Pankaj's counsel then sought clarification, asking whether there was "any ruling in terms of what needs to be cured in that 30 days." The trial court replied, "Nope. 30 days."

Consistent with the statements it made during the hearing, the trial court issued a written order stating "that pursuant to Texas Civil Practice and Remedies Code § 74.351(c)," it was granting Hernandez 30 days "to cure any alleged deficiencies" in Eden's expert report without identifying any particular deficiencies. With respect to the alleged deficiencies, the order explicitly stated: "The Court withholds any ruling on the sufficiency of Plaintiff's Chapter 74 Expert report."

While Eden did make an amended report, it is undisputed that he did not do so by the 30-day deadline. Memorial Hermann and Pankaj objected to the amended report, including on the ground that it was untimely and could not be considered.

After the untimely amendment, the trial court held two further hearings, one addressing Memorial Hermann's objections and another addressing Pankaj's. After these hearings, the trial court denied their objections in two separate written orders. The trial court did not specify the reasons for its rulings in its orders or elsewhere.

Memorial Hermann, Pankaj, and Peekaboo Pediatrics now appeal.

## DISCUSSION

**I. Was the trial court's evaluation of the sufficiency of Eden's expert report confined to his initial timely expert report or could the trial court also consider the untimely amended expert report made by Eden?**

In its written orders denying the objections to Eden's expert report, the trial court did not specify whether it considered only his initial timely report or also considered his untimely amended report. On appeal, the parties dispute whether the trial court could have properly considered the untimely amended report. Memorial Hermann and Pankaj argue that the Texas Medical Liability Act bars consideration of untimely expert reports. Hernandez argues that the trial court had discretion to consider the untimely amended report, but that the initial timely one is sufficient.

### A. Standard of review

This issue presents a question of statutory interpretation, which we review de novo. *Randol Mill Pharmacy v. Miller*, 465 S.W.3d 612, 615 (Tex. 2015).

### B. Applicable law

A claimant asserting a health care liability claim must serve an expert report on each physician or health care provider against whom she asserts a claim no later than 120 days after they file an answer. TEX. CIV. PRAC. & REM. CODE § 74.351(a). If the claimant does not timely serve an expert report, the trial court must dismiss her claim on the motion of the physician or health care provider. *Id.* § 74.351(b).

9

The expert report must provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6). Of course, the report also must be made by someone qualified to opine on these subjects in the case. *See id.* § 74.351(r)(5).

A physician or health care provider may object to the sufficiency of an expert report within 21 days of the date of service or the date after which they file an answer. *Id.* § 74.351(a). If they do not do so by this deadline, any objection is waived. *Id.*

If the trial court finds that an expert report is deficient, "the court may grant one 30-day extension to the claimant in order to cure the deficiency." *Id.* § 74.351(c). The trial court must grant the extension if the deficiency is curable. *See Scoresby v. Santillan*, 346 S.W.3d 546, 549 (Tex. 2011) ("The trial court should err on the side of granting the additional time and must grant it if the deficiencies are curable.").

When a trial court finds an expert report is deficient and grants a 30-day extension to cure the deficiency, the claimant's failure to timely serve an amended or supplemental report requires dismissal of the claimant's suit. *See Nexion Health at Beechnut v. Paul*, 335 S.W.3d 716, 718–19 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (holding that trial court could only dismiss suit when trial court found original report deficient and claimant served amended report one day late).

10

**C.     Analysis**

Hernandez essentially maintains that the Texas Medical Liability Act's provision regarding extensions only applies when the trial court finds a report deficient. Because the trial court did not find Eden's initial report deficient, Hernandez reasons, the Act's provision regarding extensions did not apply to her, and the trial court retained its inherent authority to consider an untimely document, like Eden's amended report. According to Hernandez, a trial court always has discretion to consider untimely served documents, including Eden's expert report.

At the outset, we note that the Act does not allow for what the trial court did: grant an extension without first finding Eden's report deficient. Absent an agreement of the parties to extend the deadline for serving an expert report, a trial court may grant an extension only to allow a claimant to cure a report's deficiencies. TEX. CIV. PRAC. & REM. CODE § 74.351(c); *Badiga v. Lopez*, 274 S.W.3d 681, 685 (Tex. 2009); *see also Constancio v. Bray*, 266 S.W.3d 149, 160 (Tex. App.—Austin 2008, no pet.) (explaining that under Act's plain language extension is permissible only if trial court finds report deficient). But that error is not reviewable in this accelerated interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(9) (providing jurisdiction to review interlocutory order denying motion to dismiss for failure to serve expert report required by Act but also specifying "that an appeal may not be taken from an order granting an extension" to file amended expert report).

11

Nevertheless, the trial court's noncompliance with the Act informs our assessment of Hernandez's argument. In a nutshell, Hernandez argues that when, as here, a trial court disregards the Act's provision regarding extensions by granting one under circumstances the statute does not allow, the trial court and the claimant are freed from the 30-day deadline imposed by the Act. Under these circumstances, Hernandez asserts, she need not file an amended or supplemental expert report by the 30-day deadline for the trial court to consider the amendment or supplement.

We decline to adopt Hernandez's position because doing so would be tantamount to the judicial repeal of the expert-report deadlines the Legislature set forth in the Texas Medical Liability Act. The Act requires a claimant to serve an expert report on physicians or health care providers within 120 days of their answer. TEX. CIV. PRAC. & REM. CODE § 74.351(a). If they timely object that the expert report is deficient and the trial court finds the report deficient, the trial court may grant a single 30-day extension to cure the deficiency. *Id.* § 74.351(c). These deadlines are statutory mandates, which a trial court has no discretion to disregard. *See id.* § 74.351(b), (c) (providing trial court shall dismiss when 120-day deadline is not met and "may grant one 30-day extension" to cure timely but deficient report); *Constancio*, 266 S.W.3d at 161–62 (noting that under Act "extension is a one-time event, and its length is prescribed at 30 days" and that Act "does not give trial courts discretion as to how long the extension will be"). An interpretation that disarms or

sidesteps these deadlines would frustrate their purpose, which is to ensure that trial courts quickly identify and dispose of meritless health care liability claims. *See Hebner v. Reddy*, 498 S.W.3d 37, 41 (Tex. 2016) (indicating Act's report requirement is meant to facilitate quick disposal of meritless lawsuits and prevent protracted litigation). Thus, just as when a trial court has the statutory authority to grant a 30-day extension to amend or supplement a deficient expert report and does so, when a trial court lacks the statutory authority to grant such an extension to amend or supplement a timely filed expert report but nonetheless does so, the claimant's failure to serve an amended or supplemental report by the mandatory 30-day deadline bars the trial court from considering the amendment or supplement. *See Aquatic Care Programs v. Cooper*, 616 S.W.3d 615, 625–26 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (holding trial court could not consider supplemental expert report claimant served well after 30-day extension deadline had expired).

To the extent Hernandez argues that a trial court retains its inherent authority to consider an amended or supplemental expert report that is filed outside the statutory 30-day deadline, we disagree because the Act displaces contrary law. *See* TEX. CIV. PRAC. & REM. CODE § 74.002(a) (providing that Act controls in event of conflict with another law, including rules of procedure or evidence or court rules).

Hernandez arguably might also be understood to assert that Memorial Hermann and Pankaj waived any objection to the trial court's consideration of

Eden's untimely amended expert report by failing to object when the trial court granted an extension without finding Eden's initial report deficient. That is, Hernandez conceivably could assert that Memorial Hermann and Pankaj were obligated to object when the trial court first departed from the Texas Medical Liability Act's provisions in order to later insist on compliance with its deadlines.

To the extent Hernandez asserts waiver, we disagree for three reasons.

As an initial matter, the Act does not contemplate that a physician or health care provider will ever need to object to a trial-court order to preserve error regarding an expert report. The Act directs a physician or health care provider to object to a claimant's failure to timely file an expert report or to object to a timely filed expert report as being deficient. TEX. CIV. PRAC. & REM. CODE § 74.351(a), (b). The Act also contains an explicit waiver provision, which provides that a physician or health care provider waives any objection to an expert report that is not made within 21 days of the date on which the claimant serves the expert report or 21 days after a defendant files its answer. *Id.* § 74.351(a). If the trial court overrules an objection, the physician or health care provider is then entitled to immediately appeal from the adverse ruling. *Id.* § 51.014(a)(9). The only intervening order of the trial court that the Act anticipates is a 30-day extension to correct deficiencies. *Id.* § 74.351(c). With one exception that is inapplicable in this case, an order granting such an extension is unappealable. *Id.* § 51.014(a)(9); *see Badiga*, 274 S.W.3d at 684 (holding section

14

51.014(a)(9)'s bar on interlocutory appeal from order granting 30-day extension "does not apply when no expert report" has been timely served by claimant). When, as here, there is no right of appeal from an order granting an extension, there is no error for a physician or health care provider to preserve with respect to the order.

But assuming for argument's sake that a physician or health care provider could waive error by failing to object to a trial court's order granting an extension under some circumstances, Memorial Hermann and Pankaj did not waive their complaint that Hernandez did not timely serve Eden's amended expert report in this particular instance. When the trial court granted Hernandez a 30-day extension to cure any deficiencies, the trial court expressly invoked the Texas Medical Liability Act's provision authorizing an extension. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(c). At this point in time, the only objection that Memorial Hermann and Pankaj could conceivably have made was that Hernandez was not entitled to an extension absent a finding by the trial court that Eden's initial report was deficient. When Hernandez served Eden's amended expert report, Memorial Hermann and Pankaj timely objected that Hernandez untimely served it after the 30-day deadline. Until Hernandez served Eden's amended expert report after the deadline had expired, the defendants had no occasion to complain about the untimeliness of the amendment. And, to the extent the trial court later implicitly considered Eden's untimely amended report in denying Memorial Hermann's and Pankaj's objections,

15

the trial court only made this decision when it entered its written orders denying the objections. Memorial Hermann and Pankaj timely appealed from these orders. Hence, there is no waiver. Even if Memorial Hermann and Pankaj could be said to have waived error with respect to the trial court's order granting a 30-day extension, that waiver would not extend to Hernandez's failure to comply with this deadline.

Finally, on this record, we note that the application of waiver would not vindicate the underlying purposes of error preservation. Error preservation serves at least three ends: it conserves judicial resources by giving the trial court a chance to avoid or correct error; it promotes fairness by foreclosing parties from ambushing their adversaries on appeal with issues not raised below; and it ensures that the issues presented on appeal are fully developed for resolution. *In re B.L.D.*, 113 S.W.3d 340, 350 (Tex. 2003). Here, Memorial Hermann and Pankaj objected to the untimeliness of Eden's amended expert report in the trial court. The trial court acknowledged its awareness of these objections on the record during one of the associated hearings. On appeal, the material facts are undisputed, and the parties have briefed the issue, which presents a pure question of law given the absence of any factual disputes.

Therefore, Memorial Hermann and Pankaj did not waive their complaint that Eden's amended expert report was untimely and cannot be considered on appeal. Because Hernandez did not timely serve Eden's amended expert report we will confine our review of the sufficiency of Eden's expert report to his original report,

which Hernandez timely served on the defendants. We now turn to Memorial Hermann's and Pankaj's objections to the sufficiency of the original report.

## II. Did the trial court err in denying Memorial Hermann's and Pankaj's objections that Eden's report is deficient by failing to establish the applicable standards of care, breach of these standards, or causation?

### A. Standard of review

We review a trial court's ruling regarding the adequacy of an expert report served on a physician or health care provider under the Texas Medical Liability Act for an abuse of discretion. *Baty v. Futrell*, 543 S.W.3d 689, 693 (Tex. 2018). Under this standard, we consider only the information within the four corners of the report. *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam).

### B. Applicable law

A trial court may grant a motion challenging the adequacy of an expert report "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the [Act's] definition of an expert report." *Baty*, 543 S.W.3d at 693 (quoting TEX. CIV. PRAC. & REM. CODE § 74.351(*l*)); *see also* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6) (defining "expert report" as report that gives fair summary of opinions on standard of care, breach, and causation).

To satisfy this standard, an expert report need not marshal all the claimant's proof. *Baty*, 543 S.W.3d at 693. But the report cannot be conclusory. *Id.* It must discuss the standard of care, breach, and causation with enough specificity to inform

17

the physician or health care provider of the conduct that the claimant calls into question and supply a basis for the trial court to find the claim has merit. *Id.*

The standard of care consists of what an ordinarily prudent physician or health care provider would do under the same or similar circumstances. *Am. Transitional Care Ctrs. of Tex. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001). Thus, an expert report must identify a specific act the physician or health care provider was required to perform or refrain from performing, and explain how he or she failed to fulfill his or her duty. *See Baty*, 543 S.W.3d at 694–95 (holding general statement that care should have been provided "in the proper manner" to avoid injury was conclusory and inadequate and advising that adequate report must explain what defendant should have been done differently). If the standard of care or its ostensible breach can only be inferred from the expert report, the report is inadequate. *See Palacios*, 46 S.W.3d at 880 (reasoning that expert report that was vague enough that it might have encompassed multiple unspecified complaints—closer monitoring, securer restraint, or something else—was too conclusory and therefore inadequate).

With respect to proximate causation, an expert report must identify "how and why" a breach of the standard of care caused the injury, harm, or damages by explaining the basis for the expert's statements and linking his conclusions to specific facts. *E.D. ex rel. B.O. v. Tex. Health Care*, 644 S.W.3d 660, 664 (Tex. 2022) (per curiam). The report need only explain how, as a factual matter, the

claimant will prove causation. *Id.* Whether the expert's opinion is credible or believable is not relevant to the question of whether his report is adequate. *Id.*

Talismanic words and phrases are not required. *Baty*, 543 S.W.3d at 693. An expert report does not need to use legal terminology, like "proximate cause," "foreseeability," or "cause in fact." *Columbia Valley Healthcare Sys. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017). Regardless of the exact language used, however, the report must explain, factually, how the claimant is going to prove the physician or health care provider proximately caused the injuries, harm, or damages. *Id.*

In evaluating the adequacy of an expert report, we read the report as a whole. *E.D. ex rel. B.O.*, 644 S.W.3d at 667. The report can be informal. *Palacios*, 46 S.W.3d at 879. The information in the report does not have to satisfy evidentiary requirements that will be applicable on summary judgment or at trial. *Id.*; *see also E.D. ex rel. B.O.*, 644 S.W.3d at 667 (reiterating that adequacy is not evidentiary standard and that expert report need not litigate merits as prerequisite to suit).

### C. Analysis

#### 1. Memorial Hermann

Memorial Hermann maintains that the trial court erred in finding Eden's report adequate for two reasons. First, the hospital argues that Eden did not demonstrate that its nurses breached the standard of care. Second, Memorial Hermann argues that Eden did not demonstrate the nurses caused the child's injury.

With respect to the standard of care, Memorial Hermann maintains that Eden's complaint as to the nurses is that they failed to identify signs of fetal distress and report these to the physicians so that a timely cesarean section could be performed. However, according to the hospital, these "criticisms are not supported by the events or are refuted within Eden's own report." Among other things, Memorial Hermann posits that the facts show that the "nurses recognized the changes in FHR, reported it, summoned the physicians, and implemented the multiple interventions Eden says were required." According to the hospital, the remainder of decision-making as to Hernandez's care was up to the physicians, whom the nurses could not command.

As to causation, Memorial Hermann argues that Eden attributes the child's injury to everyone who provided health care to Hernandez during labor and delivery but does not adequately explain how the nurses caused the injury. The hospital maintains that the only actionable negligence Eden asserts with respect to the nurses is that they failed to report ominous fetal heart rate data to the physicians but that Eden does not explain how doing so would have changed the outcome here. Memorial Hermann posits that even if one assumes the physicians should have performed an emergency cesarean section earlier than they did, this failure cannot be laid at the feet of the nurses because they were not the decision-makers. The hospital reasons that this decision entails the practice of medicine, not nursing.

Memorial Hermann also argues that Eden's opinions are inconsistent with the underlying facts in various ways, complaining that "Eden strategically omits all the details from the admission that directly and clearly refute his unfounded conclusion" as to causation. Moreover, the hospital maintains that the MRI is the sole evidence on which Eden relies for proof of a hypoxic brain injury, and that this evidence is too distant in time from the alleged time of injury to support Eden's causation opinion, characterizing Eden's opinion as suffering from "a giant analytical gap." Therefore, Memorial Hermann argues, his causation opinion is conclusory.

We disagree with the hospital's position that Eden's report is inadequate.

In his report, Eden states the standard of care and how the nurses breached it with the specificity required by the Texas Medical Liability Act. Among other professional obligations, Eden opines that the nurses had a duty to recognize the signs of fetal distress exhibited during labor, which included decreased variability in the fetal heart rate, accompanied for a lengthy period by low maternal blood pressure. Upon recognizing these signs of distress, the nurses had a duty to report them to the physicians so that appropriate action could be taken. The physicians, in turn, had a duty to perform an emergency cesarean section in this instance. Eden opined that the nurses breached the standard of care both by failing to recognize the signs of fetal distress and their clinical significance and by failing to report them. *See E.D. ex rel. B.O.*, 644 S.W.3d at 665–67 (holding that trial court did not abuse

21

its discretion in concluding that expert report by obstetrician-gynecologist adequately identified standard of care and breach in suit in which expert faulted doctor who delivered baby for failing to timely and accurately interpret fetal heart rate data, either personally or by making appropriate inquiries of attending nurse).

Eden likewise states causation with the required specificity in his report. Eden opines that the signs of fetal distress called for the performance of an emergency cesarean section hours before physicians finally performed one. Had the nurses discharged their duties by informing the physicians and, if necessary, by informing others further up in the chain of decision-makers, the cesarean section would in fact have been performed hours earlier and the child would not have suffered a severe brain injury resulting from receipt of inadequate oxygen during labor and delivery. This is enough to satisfy the expert-report requirement. *See id.* (holding trial court did not abuse its discretion in concluding that expert report by obstetrician-gynecologist was adequate on issue of causation in suit in which expert opined that doctor who delivered baby caused hypoxic brain injury by failing to order emergency cesarean section in time to avoid injury despite signs of fetal distress).

Properly understood, Memorial Hermann's arguments about the standard of care and causation contest the credibility of Eden's opinions. In essence, the hospital disputes the underlying facts: whether the nurses recognized and responded to the signs of fetal distress, whether their actions were enough under the circumstances,

and whether their limited role allowed them to do more without transgressing the prohibition on practicing medicine. But whether Eden is correct on the facts of the case is distinct from whether he has explained what the nurses should have done differently and how their failure to do so caused the injury in question. At this juncture in the case, Hernandez is not required to marshal the evidence and litigate the merits. *Baty*, 543 S.W.3d at 693. Whether her expert, Eden, is right or wrong on the merits is an issue for summary judgment or trial. *Palacios*, 46 S.W.3d at 879; *see also New. Med. Horizons v. Milner*, 575 S.W.3d 53, 65 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (stating "court's role is not to determine the truth or falsity of the expert's opinion, or the facts upon which the expert bases such opinions, but to act as a gatekeeper in evaluating the sufficiency of the report itself").

The same is true of Memorial Hermann's complaints that various facts on which Eden relies in his report either do not support or outright refute his opinions on the standard of care and causation. Eden identifies specific facts that in his opinion implicate the standard of care, show the nurses breached it, and establish how this caused the child's severe brain injury. At this preliminary stage, Eden need only ground his opinions in specific facts, not prove that his is the only possible interpretation of these facts or that they irrefutably support his opinions. *See Milner*, 575 S.W.3d at 65 (stating court cannot evaluate data relied on by expert, and thus "does not determine an alleged factual dispute about the underlying medical

23

records," or consider data expert failed to reference when assessing adequacy of report). An expert like Eden has to supply a fact-based explanation. *Zamarripa*, 526 S.W.3d at 460. He does not have to anticipate or rebut defensive theories the hospital might assert in response to his explanation. *Curnel v. Houston Methodist Hosp.-Willowbrook*, 562 S.W.3d 553, 562 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

Similarly, courts cannot conclude that an expert report is inadequate based on analytical gaps that in actuality are disputes about the underlying facts or merits, as opposed to the expert's failure to link his opinions to specific facts in his report. *Abshire*, 563 S.W.3d at 225–26 & n.10; *Milner*, 575 S.W.3d at 69. Here, the analytical gap Memorial Hermann emphasizes—the reliability of the MRI as evidence of a hypoxic injury sustained during labor and delivery—concerns the merits of Eden's opinion. In any event, we further note that Eden does not solely rely on the MRI, but also the child's condition at birth, which included bluish or pale skin, weak cry, slow breathing, limpness or lack of movement, and poor reflexes. Thus, even if we could consider the purported analytical gap asserted by the hospital and agreed with its assertion, this ostensible inadequacy would not be dispositive.

Finally, to the extent Memorial Hermann contends that Eden faults the nurses for not engaging in the practice of medicine, something they cannot lawfully do, we do not agree. Eden's opinions about the nurses' failure to recognize and report the signs of fetal distress, and the consequences of their failure to do so, are not

24

inadequate just because theirs is one in a chain of failures, some of which involve physicians, that Eden says operated together to cause the child's brain injury. *See Abshire*, 563 S.W.3d at 225–26 (holding that expert report provided "straightforward link between the nurses' alleged breach of the standard of care" and patient's injury by explaining how their failure to properly document his condition led to delay in diagnosis and treatment by physician, which, in turn, caused patient's injury); *Tex. Children's Hosp. v. Knight*, 604 S.W.3d 162, 177–80 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (affirming adequacy of report in which expert "explained that the TCH nursing staff's failure to notify the physicians of obvious signs of circulatory distress caused a delay in the BCM physicians' HIT diagnoses, which led to Knight's injury" and rejecting contention that expert's "proposed standards require nurses to practice medicine, to go beyond merely observing and assessing, and to second-guess the treatment decisions of the patient's physicians"). Nothing in Eden's report suggests that he advocates the nurses should have usurped the role of Hernandez's physicians or engaged in the unauthorized practice of medicine.

We hold the trial court did not abuse its discretion in rejecting Memorial Hermann's objections as to the adequacy of Eden's report on the standard of care and causation. Thus, we overrule the hospital's corresponding appellate issues.

In overruling these issues, we note that the hospital makes many additional appellate complaints about the adequacy of Eden's opinions on theories of liability

25

other than the ones we have addressed, that is, supposed nursing failures other than those involving the recognition and reporting of the signs of fetal distress under the circumstances of this case. However, because we have held that Eden's report is adequate with respect to one theory of liability concerning the nurses and their employer Memorial Hermann, we need not and do not address any others. *See Miller v. JSC Lake Highlands Operations*, 536 S.W.3d 510, 516 n.7 (Tex. 2017) (per curiam) (stating court need not consider all standards of care articulated in report after concluding others are adequate); *TTHR Ltd. P'ship v. Moreno*, 401 S.W.3d 41, 45 (Tex. 2013) (holding suit could proceed against hospital because expert's report was adequate as to one theory of liability asserting vicarious liability for agents' acts and need not address other agents); *see also* TEX. R. APP. P. 47.1 (requiring opinion to be as brief as practicable while deciding all issues necessary to dispose of appeal).

### 2. Pankaj and Peekaboo Pediatrics

Pankaj maintains that Eden's report is conclusory as to causation with respect to her alleged medical malpractice. That is, Pankaj argues that Eden does no more than assert, without explanation and solely based on his say-so, that her ostensible breaches of the standard of care—which consist of the failure to order blood-gas analysis and whole-body cooling of the child after he was born—caused the injury.

In his report, Eden opines that a pediatrician like Pankaj should have been familiar with the signs of hypoxia in a newborn, and likewise should have known

26

that the presence of these signs required her to order blood-gas testing and whole-body cooling within six hours of birth. Signs of hypoxia were present, including bluish or pale skin, weak cry, slow breathing, limpness or lack of movement, and poor reflexes. Nevertheless, despite the presence of these telltale signs, Pankaj did not order blood-gas testing or whole-body cooling, even though she took over the child's care during this critical six-hour window after his birth. According to Eden, these failures "caused and exacerbated" the severe brain injury the child sustained.

But Eden does nothing to explain how or why blood-gas testing or whole-body cooling could have prevented or lessened the severity of the child's brain injury. Indeed, Eden does not actually state what role these tests or treatments play in the diagnosis and care of newborns who are or have been hypoxic or who have a brain injury. A reasonably well-educated reader might infer the role of blood-gas testing and whole-body cooling from Eden's report, but a report that depends on such inferences does not satisfy the Texas Medical Liability Act's requirements. *See Scoresby*, 346 S.W.3d at 556 (stating that expert report must address all elements required by Act, "bare conclusions will not suffice," and "omissions may not be supplied by inference"). The point of an expert report is to inform the trial court why a given claim has merit, not to enable the court to infer a claim might have merit. At bottom, Eden simply asks the court to take his word for it that the outcome would have differed if Pankaj had ordered blood-gas testing and whole-body cooling. That

is not enough to fulfill the Act's expert-report requirement as to causation. *See*

*Abshire*, 563 S.W.3d at 224 (observing that bare say-so of expert is not adequate);

*Zamarripa*, 526 S.W.3d at 460 (reciting that say-so is insufficient and "the expert

must explain the basis of his statements to link his conclusions to the facts").

We hold Eden's report is conclusory with respect to how Pankaj allegedly

caused the child's brain injury, and the trial court therefore abused its discretion in

denying Pankaj's objection to the report. We sustain Pankaj's issue on causation.

### III. Did the trial court err in denying Memorial Hermann's and Pankaj's objections that Eden is unqualified to submit an expert report in this suit?

#### A.    Standard of review

We review a trial court's ruling regarding whether a person is qualified to

opine on the standard of care in an expert report for an abuse of discretion. *See*

*Zamarripa*, 526 S.W.3d at 461 n.37 (concluding trial court "was within its

discretion" in deciding nurse was qualified to opine on standard of care in report).

We likewise review a trial court's ruling as to whether a person is qualified to opine

on the issue of causation in an expert report for an abuse of discretion. *Puppala v.*

*Perry*, 564 S.W.3d 190, 202 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

#### B.    Applicable law

Only one who qualifies as an expert may satisfy the Texas Medical Liability

Act's report requirement. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(5).

Accordingly, a report made by an unqualified person does not constitute a good-faith effort to satisfy the Act's expert-report requirement. *Milner*, 575 S.W.3d at 61.

### 1. Opinion on standard of care applicable to a doctor

In a suit asserting a health care liability claim against a physician for injury of a patient, a person may qualify as an expert on the standard of care only if he is a physician who is practicing medicine at the time he testifies or was practicing medicine when the claim arose; is knowledgeable about the standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition at issue; and is qualified by training or experience to offer an expert opinion on those standards. TEX. CIV. PRAC. & REM. CODE § 74.401(a); *see also id.* § 74.351(r)(5)(A) (defining "expert" in context of claims alleging physician breached applicable standard of care as one who is qualified to testify under section 74.401).

A physician is not qualified to testify as an expert on every medical question simply by virtue of being a medical doctor, but the qualification requirement is not intended to be especially narrow in application. *Benge v. Williams*, 548 S.W.3d 466, 472 (Tex. 2018). A physician need not specialize in the particular type of medical practice at issue to qualify as an expert. *Zamarripa*, 526 S.W.3d at 461 n.37; *Milner*, 575 S.W.3d at 62. The dispositive inquiry is whether the physician has expertise on the very subject about which he opines. *Milner*, 575 S.W.3d at 62. In general, a physician who practices outside the specialty at issue may nonetheless qualify as an

29

expert under two circumstances: if he has practical knowledge of what is ordinarily done by physicians under circumstances like those that confronted the physician who is being sued or if the subject matter is common to and equally recognized and developed in all fields of medical practice. *Id.*; *see also Owens v. Handyside*, 478 S.W.3d 172, 185 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (indicating that physician need not practice in particular medical field in question if he shows he has knowledge, skill, experience, training, or education concerning subject).

### 2. Opinion on standard of care applicable to a nurse

In a suit asserting a health care liability claim against a health care provider, including a registered nurse, for injury of a patient, a person may qualify as an expert on the standard of care only if he practices health care in a field involving the same type of care or treatment when he testifies or was practicing in this field when the claim arose; is knowledgeable about the standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition at issue; and is qualified by training or experience to offer an expert opinion on those standards. TEX. CIV. PRAC. & REM. CODE § 74.402(b); *see also id.* §§ 74.001(a)(12)(A)(i), 74.351(r)(5)(B) (including "registered nurse" in definition of "health care provider" and defining "expert" in context of claims alleging health care provider breached applicable standard of care as one who is qualified to testify under section 74.402).

A physician is not qualified to opine on the standard of care applicable to nurses simply by virtue of his medical degree. *Tawa v. Gentry*, No. 01-12-00407-CV, 2013 WL 1694869, at *12–14 (Tex. App.—Houston [1st Dist.] Apr. 18, 2013, no pet.) (mem. op.). But a physician may qualify as an expert as to the nursing standard of care in a given instance if he shows he is familiar with the standard of care for nurses as to the care or treatment of the medical condition in question, including through the supervision or training of nurses in this context. *See Doctors Hosp. v. Hernandez*, No. 01-10-00270-CV, 2010 WL 4121678, at *6–7 (Tex. App.—Houston [1st Dist.] Oct. 21, 2010, no pet.) (mem. op.) (affirming trial court's ruling that obstetrician-gynecologist was qualified to make expert report as to nurses, given report's recitation that he was familiar with standard of care applicable to medical and nursing care as to postpartum hemorrhage and had taught physicians and nurses regarding the prevention and treatment of this condition); *see also IPH Health Care Servs. v. Ramsey*, No. 01-12-00390-CV, 2013 WL 1183307, at *6 (Tex. App.—Houston [1st Dist.] Mar. 21, 2013, no pet.) (mem. op.) (stating physician who is familiar with standard of care applicable to other health care providers "based on experience working with or supervising them" may serve as expert on this issue).

### 3. Opinion on causation as to doctors and nurses

With the exception of claims made against dentists, podiatrists, and chiropractors, a person may qualify to opine that a physician's or other health care

provider's breach of an applicable standard of care caused a patient's injury, harm, or damages in an expert report only if that person is a physician who is qualified to render a causation opinion under the Texas Rules of Evidence. TEX. CIV. PRAC. & REM. CODE §§ 74.351(r)(5)(C), 74.403(a); *Puppala*, 564 S.W.3d at 202. To qualify as an expert under the rules of evidence, the physician must possess expertise on the particular medical subject in question by virtue of "knowledge, skill, experience, training, or education." TEX. R. EVID. 702; *Puppala*, 564 S.W.3d at 202.

## C. Analysis

### 1. Memorial Hermann

Memorial Hermann argues that Eden is unqualified to opine as to when in time the child suffered the brain injury and about who or what caused the injury. But the hospital's arguments in this regard appear to be confined to challenging whether Eden is qualified to draw conclusions from an MRI report and whether he is qualified to offer opinions about the standard of care applicable to newborns, in that Eden is not a pediatrician and lacks experience treating infants, including newborns.

Accepting Memorial Hermann's position about Eden's qualifications for argument's sake, the hospital does not dispute Eden's qualifications to opine about the standard of care applicable to labor and delivery nurses before Hernandez's child was born. Nor could the hospital do so on this record. Eden has been an obstetrician-gynecologist and maternal-fetal-medicine specialist for decades. His report recites

that in his decades of practice, he has supervised and trained nurses in the labor and delivery care setting, including training as to fetal heart rate tracings, and he is therefore familiar with the standard of care that applies to nurses in this context. Eden's present job duties include covering labor and delivery, and he has cared for hundreds of patients who experienced problems like the ones at issue in this case.

While a physician is not qualified to opine on the standard of care applicable to nurses in every instance, a physician is qualified to do so when his interaction with nurses, including the supervision and training of them, has familiarized him with the standard of care. *Hernandez*, 2010 WL 4121678, at \*6–7; *Harvey v. Kindred Healthcare Operating*, 578 S.W.3d 638, 647–48 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Thus, Eden is qualified to opine on the standard of care applicable to the nurses who cared for and treated Hernandez and her fetus while she was in labor through the delivery of her son regarding the recognition and reporting of signs of fetal distress, including the interpretation of fetal heart rate data, as well as the breach of this standard. *See, e.g.*, *Harvey*, 578 S.W.3d at 647–48; *San Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 812–14 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *Manor Care Health Servs. v. Ragan*, 187 S.W.3d 556, 562–63 (Tex. App.—Houston [14th Dist.] 2006, pet. granted, judgm't vacated w.r.m.).

Even if Memorial Hermann is correct that Eden is unqualified to opine on the standard of care as to post-delivery nursing, this fact is immaterial with respect to

whether the Hernandez's claim may proceed against the hospital. The expert-report requirement of the Texas Medical Liability Act does not impose a summary-judgment-like procedure in which courts must evaluate each and every challenged theory of liability an expert espouses for merit. *See Miller*, 536 S.W.3d at 517 (stating that report does not have to satisfy summary-judgment requirements). The report requirement merely obliges a claimant to make a threshold showing through a qualified expert that her claim is not meritless. *See Baylor Scott & White, Hillcrest Med. Ctr. v. Weems*, 575 S.W.3d 357, 363 (Tex. 2019) (describing Act's expert-report requirement as threshold hurdle ensuring frivolous suits are disposed of before litigation gets underway); *see also* TEX. CIV. PRAC. & REM. CODE § 74.351(k) (providing that expert report is not admissible at trial, cannot be used in deposition, and shall not be referred to by parties in any way after it has fulfilled its purpose at threshold of case). Once this threshold has been crossed, no further inquiry is necessary regarding the report's adequacy. *See Miller*, 536 S.W.3d at 516 n.7 (stating court need not consider all standards of care articulated in expert report after concluding report is adequate with respect to some standards report articulates).

Eden likewise is qualified to opine on causation. Eden states in his report that he has extensive experience with respect to fetal monitoring and care of obstetrical patients and fetuses with problematic fetal heart rate tracings during labor and delivery, including those indicative of the fetal distress at issue in this case.

34

Furthermore, Eden states he has extensive experience regarding the care of newborns who show signs of hypoxia at birth, having "cared for hundreds of patients who experienced problems of the fetus during labor and delivery like the ones experienced here." Eden opines that the child developed hypoxia during the labor and delivery process, relying on specific fetal heart rate data. For further support, he additionally relies on the clinical presentation of the child at delivery, which included bluish or pale skin, weak cry, slow breathing, limpness or lack of movement, and poor reflexes. Based on these circumstances, Eden maintains the child should have been delivered by emergency cesarean section hours earlier, and would have been delivered earlier had the nurses fulfilled their professional duties to recognize and report the signs of fetal distress during labor and delivery. According to Eden, the nurses' failure to do so was therefore one cause of the child's severe brain injury. In short, Eden's report establishes that he is qualified to opine that nursing failures involving the failure to recognize and report signs of hypoxia caused the child's injury. *See Puppala*, 564 S.W.3d at 202 (specifying that experience, among other things, may qualify physician to opine on causation).

As with the standard of care, that Eden might be unqualified to opine on other causation-related issues does not entitle Memorial Hermann to dismissal because he is qualified to offer at least one causation opinion as to the nurses' breaches—specifically, that their failure to recognize and report fetal distress caused the injury.

35

*See Miller*, 536 S.W.3d at 516 n.7; *Moreno*, 401 S.W.3d at 45. We therefore need not address Eden's other causation opinions to reject Memorial Hermann's contention that Eden failed to establish he is qualified to opine on causation. We note, however, that the objection Memorial Hermann filed in the trial court does not reference Eden's reliance on the MRI or assert he is unqualified to interpret one. Thus, the hospital waived that complaint. TEX. CIV. PRAC. & REM. CODE § 74.351(a).

We hold the trial court did not abuse its discretion in rejecting Memorial Hermann's objection that Eden is unqualified to make an expert report in this case. Thus, we overrule the hospital's appellate issue regarding Eden's qualifications.

## 2. Pankaj and Peekaboo Pediatrics

Pankaj argues that Eden, who is an obstetrician-gynecologist and maternal-fetal-medicine specialist, is unqualified to opine on the post-birth standard of care applicable to a pediatrician like herself or the breach of this standard of care.

Eden is a longtime obstetrician-gynecologist and maternal-fetal-medicine specialist and has robust qualifications in these fields of medicine. In his report, he also represents that he is familiar with the standards of care applicable to "neonatologists" (physicians concerned with the care and treatment of newborns) in general and "the proper care of a newborn who shows signs of hypoxia at birth" in particular. But nothing in his report indicates how Eden attained this familiarity.

36

Eden does not purport to be a pediatrician or neonatologist, and his report implicitly recognizes that these fields differ from the ones in which he practices. Eden discusses his experience at length, but that discussion lacks facts indicating he has knowledge, skill, experience, training, or education that extends to post-birth matters in general or the pediatric standard of care within six hours of birth in particular. He does not purport to have ordered blood-gas analysis or whole-body cooling in the treatment of a newborn, whether the newborn was hypoxic or not. Both his past experience and present job duties focus on the period of pregnancy through labor and delivery of the child. By his own representation, that is the context in which he has extensive experience. Unlike nurses, Eden does not claim he has supervised or trained pediatricians in general or with respect to the prevention or treatment of hypoxic injuries in particular. Nor does Eden represent that the care and treatment of newborns exhibiting signs of hypoxia, including blood-gas analysis and whole-body cooling, is well-known to all physicians or some subset of physicians. Finally, Eden does not identify any peer-reviewed articles he has authored on the subject of post-birth care or pediatrics that relate to the blood-gas analysis or whole-body cooling of hypoxic newborns, as opposed to the publications he emphasizes regarding testing during pregnancy and fetal monitoring during labor and delivery.

The lone professional activity from which Eden's qualification to opine on pediatric matters could conceivably be extrapolated is his service on hospital

committees concerning physician credentialing, physician peer review, risk management, and quality assurance. In his role on these committees, Eden states that he has evaluated the standard of care and practice of physicians who care for newborns. But Eden does not claim to have become familiar with the use of blood-gas analysis or whole-body cooling in this role. And generic representations about service on a physician peer review committee or the like is not enough to qualify one as an expert on the standard of care applicable to another field of medical practice, specific medical tests and treatments, or the care of particular medical conditions. *See Tomasi v. Liao*, 63 S.W.3d 62, 66 (Tex. App.—San Antonio 2001, no pet.) (holding that membership on peer review committee of large hospital with active surgical service did not qualify non-surgeon to opine on postoperative care).

In short, Eden does not supply any facts in his report that support his claim that he is familiar with the applicable pediatric standard of care. To be sure, it is not inconceivable that an experienced obstetrician-gynecologist could be familiar with the pediatric standard of care as it pertains to hypoxic newborns during the period shortly after delivery, but Eden's report does not show that this is the case here. Instead, we are left with only Eden's say-so that he possesses this expertise. Say-so is not enough to establish one's qualifications to opine on the standard of care. *See Rosemond v. Al–Lahiq*, 362 S.W.3d 830, 835 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (noting that it was possible physician's certifications, training,

and experience made him knowledgeable about diagnosis, care, and treatment of injury at issue but court could not ascertain from his report or curriculum vitae whether physician actually had this knowledge and he thus had not shown he was qualified); *In re Windisch*, 138 S.W.3d 507, 513–14 & n.11 (Tex. App.—Amarillo 2004, orig. proceeding) (per curiam) (holding that expert report failing to show qualifications to opine on standard of care was inadequate and remarking that report cannot simply state in conclusory way that expert is qualified on subject at issue).

We hold Eden's report is conclusory as to his qualifications to opine on the pediatric standard of care, and the trial court therefore abused its discretion in denying Pankaj's objection to the report. We sustain Pankaj's issue on qualifications.

## CONCLUSION

We affirm the trial court's order denying Memorial Hermann's objection to Eden's expert report. But we set aside the trial court's order denying Pankaj and Peekaboo Pediatrics' objection to Eden's report. We remand this cause to the trial court for further proceedings consistent with our opinion, including the entry of an order dismissing Hernandez's claims against Pankaj and Peekaboo Pediatrics and awarding reasonable and necessary attorney's fees to these two defendants.

Gordon Goodman
Justice

Panel consists of Chief Justice Adams and Justices Kelly and Goodman.